No. 84,995

In the Matter of GREGORY M. COGGS, *Respondent.*

(14 P.3d 1123)

Opinion filed December 8, 2000.

*Stanton A. Hazlett*, disciplinary administrator, argued the cause and was on the brief for the petitioner.

*Gregory M. Coggs*, respondent, argued the cause and was on the brief pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Gregory M. Coggs, of Kansas City, Kansas, an attorney admitted to the practice of law in Kansas.

Five separate disciplinary complaints were filed against respondent alleging lack of competence, diligence, and communication, unreasonable fees, and conflicts of interest. A formal hearing was held before a hearing panel of the Kansas Board for Discipline of Attorneys. The hearing panel concluded that respondent violated the KRPC in each instance. Two members of the panel recommend that respondent be suspended from the practice of law for one year; one member recommends indefinite suspension. Respondent filed exceptions to the panel's report, and the matter is now before this court for final determination.

The facts for each complaint as determined by the hearing panel are as follows:

### Canady Complaint

"6. a. Linda D. Canady (the Complainant) and her sister, Sherl Canady, retained the Respondent in May, 1994, to establish property claims in the probate of their father's estate. Each of the sisters paid the Respondent $250.00. The deceased's name was William H. Canady and he died on February 17, 1994.

"b. On June 8, 1994, a Petition for Letters of Administration was filed on behalf of Sherl Canady by the Respondent. The Respondent secured publication of the case and a hearing was ordered for July 14, 1994. In the petition it was requested that Sherl Canady be appointed Administrator of the estate.

"c. On July 14, 1994, an Entry of Appearance and Petition of Spouse for Letters of Administration was filed. This document was filed by Thomas Hill on behalf

of the spouse, Bebely Canady. That petition requested that Bebely Canady be appointed Administrator or Co-administrator. On July 26, 1994, a Petition for Statutory Allowances was filed by John P. Biscanin on behalf of a minor child of the decedent.

"d. On August 9, 1994, the Respondent appeared at a hearing with Sherl Canady. At that hearing, the judge appointed Sherl Canady and Bebely Canady as Co-administrators. On July 25, 1996, a letter was written by the Respondent to Judge David P. Mikesic. In that letter, the Respondent asked the judge to sign an order appointing Co-administrators which the Respondent indicated to the judge had been sent to other counsel in the case, but had not been returned. The court file shows that an Order Appointing Co-Administrators was signed by Judge Mikesic and was file-stamped on September 4, 1996 (two years after it was ordered).

"e. On March 14, 1997, the Respondent filed a Petition to Settle Journal Entry. In that petition, the Respondent made reference to an Order Appointing Co-Administrators. The court file reflects that a second Order Appointing Co-Administrators was filed with the court on April 15, 1997. This Order was also signed by Judge Mikesic.

"f. On April 22, 1997, the Respondent filed a Notice of Hearing on a Petition for the Appointment of a Single Administrator. The Petition was set for hearing on May 13, 1997. On June 23, 1997, Sherl Canady was appointed as the sole Administrator of the estate subject to the filing of an oath and bond in the amount of $30,000.00.

"g. The Respondent and Sherl Canady spoke after her appointment as Administrator about obtaining an Administrator's bond. Sherl Canady went to the Respondent's office on September 8, 1997, and signed documents in connection with becoming the Administrator. At that meeting the Respondent told her he would get back with her regarding what to do next in the case. Sherl Canady did not hear again from the Respondent after that meeting.

"h. Sherl Canady and her sister then hired Tim Evans to conclude the estate. Mr. Evans entered his appearance in the Canady Estate on February 19, 1998. On March 11, 1998, Mr. Evans obtained an Order to Reduce Bond for Sherl Canady which reduced the bond to $1,000.00. An Inventory and Valuation was filed on October 13, 1998. Letters of Administration were granted to Sherl Canady on October 13, 1998. Mr. Evans filed a Journal Entry of Final Settlement on January 8, 1999."

Respondent filed only one exception to the panel's findings of fact, and it is not material to the violation found nor the recommendation.

## *Cunningham* Complaint

"4. a. In April of 1992, the Respondent prepared the Last Will and Testament of Frances O. Cunningham. In that document the Respondent was named executor to serve without bond.

"b. The Respondent, in April of 1992, also prepared a trust instrument for Ms. Cunningham which provided for the income of the trust to be paid to Ms. Cunningham for her lifetime and thereafter to certain named relatives. Michelle Holland was named trustee of the trust. The Respondent recommended Ms. Holland to Ms. Cunningham. He advised Ms. Cunningham that Ms. Holland had a college degree and had been employed by the Respondent to do his payroll and taxes. Ms. Holland, at the time the trust was prepared, ran a business called MYH Consultants. Her business card indicated that she provided accounting, consulting, and tax preparation services. The Respondent did not tell Ms. Cunningham that Ms. Holland had previously filed for bankruptcy relief, nor that he had represented Ms. Holland in that matter. Additionally the Respondent represented Ms. Holland in numerous matters after the bankruptcy filing, none of which was disclosed to Ms. Cunningham.

"c. On April 28, 1992, the trust instrument was signed. Under the terms of the trust, Ms. Cunningham transferred money held in banking accounts and Certificates of Deposit at Commercial National Bank in Kansas City, Kansas to Ms. Holland, as trustee. Bank records from the Phillips Family Trust show a deposit of $94,238.70 of Ms. Cunningham's funds on April 30, 1992.

"d. In June of 1993, in several transactions, the Respondent borrowed a total of $7,000.00 from the Phillips Family Trust. According to the Respondent, those transactions were handled through Ms. Holland and he did not discuss the loan with his client, Ms. Cunningham. On March 1, 1999, during the course of the investigation of the disciplinary complaint, the Respondent provided a copy of the promissory note evidencing the Respondent's loan from the trust. The note provided for monthly payments of $140.28 beginning the first day of July, 1993, until paid in full. The note bore interest at the rate of 7.5% per annum. The note was unsecured. The Respondent testified that, at the time of the loan, he could not secure conventional financing. The Respondent has made only a minimal repayment of the loans to the trust: $500.00 or less. He nonetheless testified that, in his view, this was a good investment for the trust, i.e. he was benefiting the trust as well as himself.

"e. Ms. Cunningham was never advised of the terms of the loan, was never given reasonable opportunity to seek the advice of independent counsel regarding the transactions, and did not consent in writing to the loan. The Respondent indicated that it was his opinion that, at the time of the loan, Ms. Cunningham was not his client, i.e. in his view no attorney-client relationship existed at the time of the loan.

"f. Ms. Cunningham died on March 13, 1994. The Respondent acted as the executor of the estate and the attorney for the estate and filed a Petition for Probate of Will and Issuance of Letters Testamentary on May 5, 1994. Letters Testamentary were granted on June 2, 1994.

"g. An Inventory and Valuation was filed by the Respondent in the estate on November 10, 1994. That Inventory showed the total value of the estate as $57,272.00. That amount included $32,000.00 held in real estate which, under

the terms of the trust agreement drafted by the Respondent, was to be transferred to the Frances Cunningham Trust. The total value of personal property was listed as $10,511.88. He also listed $14,760.12 in cash held in a bank account.

"h. On August 14, 1996, the Respondent filed an Amended Petition for Final Settlement. In that document, the Respondent requested that he be compensated in the amount of $2,500.00 for his duties as executor and $6,500.00 for services he performed as the estate's attorney and for work performed by himself and his office staff. On August 15, 1996, a Journal Entry of Final Settlement was filed by the Respondent in which he was partially compensated for his services as executor and attorney for the executor in the amount of $3,500.00. On August 27, 1996, a Supplemental Journal Entry of Final Settlement was filed by the Respondent in which he was awarded an additional $3,292.03 for services rendered by the Respondent, his staff of legal assistants and his secretaries. At the time the district court approved the Respondent's fees, the district court was not aware that the estate had paid $2,927.02 in interest to the State of Kansas as a penalty for delinquent Inheritance Tax. Additionally, Respondent did not disclose to the court that he was indebted to the trust in the amount of $7000.00 plus interest, nor that he was in default on his obligation.

"i. The Respondent opened the Cunningham estate on May 5, 1994. The Supplemental Journal Entry of Final Settlement was filed by the Respondent on August 27, 1996. The Respondent was dilatory in the handling of a simple estate with no complicated legal issues. Additionally, the Kansas Inheritance Tax Return was due on December 13, 1994, and was not filed until August, 1996. The Respondent undertook to file the return on behalf of the trustee who was charged with his obligation under the trust the Respondent had prepared. The Respondent testified that he did not file the return on a timely basis because he believed there was an argument the assets of the revocable trust would not have to be included as assets of the decedent because there was a revocable trust. He was unable to find any support for his theory. The Respondent's lack of diligence resulted in interest accumulating on the Kansas Inheritance Tax in the amount of $2,927.02. The respondent took no action, however, to determine the actual value of the assets held in the trust on the date of death of the decedent. Rather he incorrectly reported in the return the value of the assets initially *transferred into* the trust.

"j. On August 16, 1996, the Respondent paid himself the partial fee granted to him in the amount of $3,500.00 out of the Cunningham estate account. He knew that this check would reduce the estate account to a balance of approximately $3,400.00 and that an inheritance tax obligation still existed in the amount of $17,204.08. The trust document prepared by the Respondent for Ms. Cunningham provided that the trustee 'Shall pay from the trust estate, directly or through my personal representative' all inheritance taxes. According to the Respondent, on August 15, 1996, he solicited $15,000.00 from the trustee to cover the inheritance tax obligation. Ms. Holland provided the Respondent with three (3) checks, each in the amount of $5,000.00. He then deposited those three (3) checks in the estate account. All three (3) of these checks were eventually returned for insuf-

ficient funds. On August 16, 1996, the Respondent wrote a check to the Kansas Inheritance Tax Division on the Cunningham estate account in the amount of $17,204.09. In spite of the fact that insufficient funds existed in the estate account, UMB Bank honored the check for inheritance taxes. On February 4, 1997, UMB Bank filed a Petition to Reopen the Estate and Set Aside [the] Journal Entry of Final Discharge. On February 4, 1997, Judge David Mikesic signed an Order Setting Aside [the] Journal Entry of Final Discharge and for a Hearing on [the] Petition to Reopen Estate. Judge Mikesic ultimately found that UMB Bank's petition should be granted because the executor had not discharged certain obligations of the estate. A hearing was held on February 24, 1997. On that date, Judge Mikesic gave the Respondent forty-eight (48) hours to reimburse the estate his fees. The Respondent has obtained additional funds from the trustee and therefore reimbursed some money, but at the present time there exists an obligation on the part of the Estate of approximately $7,000.00.

"k. The Respondent took no action to determine from the Trustee why the assets of the trust had been depleted such that the inheritance tax could not be paid. After this matter was filed, the Respondent and his counsel asked the Trustee where the money was and she indicated that she had lost the funds in the market. The Respondent took no action on behalf of the estate to investigate the matter.

"l. Bank statements for the Cunningham trust account were mailed to the Respondent's post office box in care of the Respondent. The Respondent borrowed money from the Cunningham trust in the summer of 1993.

"m. It also appears to the Hearing Panel that the Respondent ran up the costs in the Cunningham estate by conducting an inventory that goes far beyond that which is required.

"n. At the time the Respondent recommended that Ms. Holland serve as the trustee, the Respondent knew Ms. Holland had no experience acting as a trustee. Additionally, at that time the Respondent knew that Ms. Holland had filed a Chapter 7 bankruptcy in 1989, because he represented her in that matter. Through that representation, the Respondent knew that Ms. Holland discharged nearly $400,000.00 in debt. He failed to disclose these matters to Ms. Cunningham.

"o. On July 8, 1997, the Respondent filed a Chapter 13 bankruptcy on behalf of Ms. Holland. That case was dismissed on September 16, 1998, because Ms. Holland was in default on payments and the plan was not feasible. Then, on October 9, 1998, the Respondent filed a Chapter 13 bankruptcy on behalf of Ms. Holland. Again, that case was dismissed because Ms. Holland defaulted on the plan payments. In addition to representing Ms. Holland in those three bankruptcies, the Respondent also represented Ms. Holland in at least six (6) other matters, spanning from the 1980s through 1998."

## Respondent filed the following exceptions:

1. "Respondent did not tell Ms. Cunningham that Ms. Holland had previously filed for bankruptcy relief, nor that he had represented her in this and other matters."

In this regard, Respondent states in his brief in this court:

"Mrs. Cunningham was consulted about the appointment of Ms. Holland as trustee. She was advised by Respondent that Ms. Holland was an accountant, that Respondent had used her services. However, Mrs. Cunningham was not advised that Respondent had represented Ms. Holland in the past."

Thus, respondent admits that he did not tell Cunningham that he had represented Holland. It is reasonable to infer from respondent's silence on the matter that he did not advise Cunningham that the person he was recommending as trustee had filed for bankruptcy relief.

2. "The initial compensation paid Respondent was for his services as executor and attorney."

The Journal Entry of Final Settlement recites that Coggs performed the services of executor and was partially compensated for his services as attorney for the executor. Coggs correctly points out that the journal entry he prepared does not state that he was compensated for his services as executor.

3. "At the time the district court approved Respondent's fees, the court was not aware that the estate had paid $2,927.02 in interest as a penalty for delinquent Inheritance Tax."

The journal entries that contained the provisions for Coggs' fees were filed on August 14 and August 27, 1996. The inheritance tax closing letter was not filed until several days later, August 30, 1996.

4. "Respondent undertook to file the Inheritance Tax Return on behalf of the trustee who was charged with this obligation and in the return incorrectly reported the value of the assets transferred into the trust rather than the value of the assets on the date of decedent's death."

On the inheritance tax return, Coggs used the amount initially placed in trust as the value at date of death.

5. "Respondent was dilatory in the handling of a simple estate with no complicated legal issues."

Frances Cunningham died in March 1994 with real estate valued at $32,000, bank accounts and money of $14,760.12, and personal property valued at $10,511.88. Coggs incurred a $2,972 interest penalty for filing the inheritance tax return 11 months late.

6. "It appears Respondent ran up the costs in the estate by conducting an inventory that goes far beyond that which is required."

The inventory and valuation filed by Coggs included 234 items of furniture, household goods, and wearing apparel. Many of the items are valued at $1 and $2.

7. "The Respondent took no action to determine from the trustee why the assets of the trust had been depleted and no action to investigate the claimed loss of funds in the market."

Coggs testified that when checks written on the trust assets bounced, he questioned Michelle Holland and she told him that she was moving the money from one account to another. Coggs also testified that he and the attorney who represented him in the disciplinary proceedings had once asked Holland where the money was. She told them she lost the money by making an investment on margin and the margin was called. Coggs testified that he did not ask Holland for documentation to support what she told him about disposition of the trust funds. The record shows that the district court, in response to a petition by Coggs, issued an order to Michelle Holland as trustee to appear and show cause why $7,174.16 had not been paid to UMB Bank. The record does not show whether Holland appeared in response. The few efforts made by Coggs were at very best half-hearted and wholly, predictably ineffective.

8. "Bank statements for the trust account were mailed to the Respondent's post office box *in care of the Respondent*."

We are uncertain about the source of the panel's finding. The record contains a photocopy of a bank statement from May 1992 that shows a deposit of $94,238.70, which must be the initial deposit of assets for the trust that was created in April 1992. That statement was mailed to Michelle Holland c/o Gregory Coggs.

We find no merit in the Exceptions filed by the respondent, and the record supports the panel's findings.

## *Williams* Complaint

"2. a. On August 14, 1994, James A. Williams (the Complainant) was injured in a work-related accident. A truck he was operating overturned after being im-

properly loaded. His employer was Metro Recycling Company. The truck had allegedly been loaded negligently by a third party, Owens Corning.

"b. Mr. Williams first retained Michael McIntosh to represent him in connection with a worker's compensation claim and a third party negligence claim against Owens Corning. Mr. McIntosh concluded Mr. Williams' worker's compensation claim to Mr. Williams' satisfaction. Mr. McIntosh was then sentenced to prison for a felony conviction before the conclusion of the third party claim against Owens Corning. The Respondent then assumed the representation of Mr. Williams.

"c. On August 14, 1996, one (1) day before the statute of limitations ran in Mr. Williams' claim against Owens Corning, the Respondent filed a petition on behalf of Mr. Williams against Owens Corning (Wyandotte County District Court, Case No. 96C3595). No filing fee was paid by the Respondent at the time the action was filed. A request was made for service by the Respondent.

"d. On August 26, 1996, the Clerk of the Civil Department of Wyandotte County District Court mailed the Respondent a letter informing him the filing fee had to be paid in Mr. Williams' case by September 5, 1996, or the case would be referred to Administrative Judge Philip Sieve. On September 11, 1996, Judge Sieve sent a letter to the Respondent informing him that the filing fee was to be paid by September 18, 1996. On September 16, 1996, the Respondent paid the filing fee.

"e. On October 25, 1996, Judge Murgia mailed a letter to the Respondent informing him that Mr. Williams' case would be dismissed on November 12, 1996, unless it was disposed of by that date. On November 21, 1996, the Respondent signed an order dismissing Mr. Williams case *without prejudice*. At the time of the dismissal no service of process had been obtained on the defendant, Owens Corning.

"f. On May 22, 1997, the Respondent filed another lawsuit on behalf of Mr. Williams against Owens Corning arising out of the same set of facts previously pleaded (Wyandotte County District Court, Case No. 97-2121). The defendant, Owens Corning was served with process in this action. The Respondent, on August 15, 1997, signed an order dismissing this action because the statute of limitations had run on Mr. Williams' claim. The Respondent informed the investigator of the disciplinary matter that he felt that the second lawsuit could successfully be filed under K.S.A. 60-518. K.S.A. 60-518 allows an action to be refiled within six (6) months if the initial case was *commenced* within due time and the matter was dismissed other than on the merits. The first action filed by the Respondent was not *commenced* within the statute of limitations as contemplated by K.S.A. 60-518 because the Respondent had failed to obtain service of process in that case.

"g. The Respondent and Mr. Williams then attempted to negotiate the settlement of a potential legal negligence claim against the Respondent by Mr. Williams. The two (2) parties could not reach an agreement and Mr. Williams then filed his complaint with the Disciplinary Administrator's Office.

"h. On April 30, 1997, the Respondent filed a Chapter 13 bankruptcy plan for Mr. Williams. The Respondent failed to list Mr. Williams' claim against Owens Corning in the Statement of Financial Affairs. Subsequently, after the dismissal of the second civil case filed by the Respondent on behalf of Mr. Williams, the Respondent failed to amend the Statement of Financial Affairs to include a possible claim for legal negligence and malpractice against the Respondent as an asset of the bankruptcy estate."

Coggs filed the following exceptions:

1. "Respondent filed a petition on behalf of Mr. Williams and a request was made for service by the Respondent."

The Formal Complaint against Coggs in the Williams matter contains this paragraph 4:

"On August 14, 1996, one (1) day before the statute of limitations ran in the complainant's claim against Owens Corning, the respondent filed a petition on behalf of the complainant against Owens Corning. . . . No filing fee was paid by the respondent at the time the action was filed. A request was made for service by the respondent."

In his answer, Coggs states: "[A]dmits paragraph 4 but states that an employee of Respondent physically filed the petition which had been drawn by Mr. McIntosh and signed by Respondent and further states that three different forms of praecipes for . . . service exist concerning this matter."

2. Coggs concedes that this second exception is not material to any issue before the court, and thus we will not consider it.
We find no merit in respondent's exceptions.

### *Jenkins* Complaint

"5. a. On August 3, 1994, Andre Jenkins was terminated from his employment by the Kansas Department of Administration. On October 15, 1994, Mr. Jenkins filed a complaint with the Kansas Human Rights Commission. Mr. Jenkins then requested and received a Right to Sue letter from the Equal Employment Opportunity Commission (EEOC). That letter was received on June 14, 1997. On September 15, 1997, Mr. Jenkins pro se filed an action in federal court against the Kansas Department of Administration. The suit alleged that Mr. Jenkins was terminated from his job based on racial discrimination. This complaint was filed ninety-three (93) days after Mr. Jenkins received the Right to Sue letter. The applicable federal statute required that the suit be filed within ninety (90) days from the receipt of the Right to Sue letter from the EEOC.

"b. Mr. Jenkins made a request for counsel to the judge hearing the case, the Honorable Gerald Rushfelt. On November 6, 1997, Judge Rushfelt appointed the

Respondent to represent Mr. Jenkins in this matter. In the order appointing the Respondent as counsel, Judge Rushfelt suggested to the Respondent that the Respondent review the *pro se* complaint which had been filed and determine if an amended complaint should be filed.

"c. Robert North, staff attorney for the Kansas Department of Administration, sent a letter to the Respondent on December 8, 1997. In the letter he noted that the Respondent had not filed an entry of appearance in Mr. Jenkins' case. Mr. North also requested that the Respondent get in touch with him prior to a scheduling conference which was set for January 5, 1997. The Order setting the scheduling conference required the parties to discuss the case prior to the conference. On December 24, 1997, Mr. North sent a letter to Judge Rushfelt. In that letter he noted that the Respondent had not responded to Mr. North's letter of December 8, 1997, and had not returned the telephone call made to him. On January 5, 1998, the Respondent sent a letter to Mr. Jenkins and asked Mr. Jenkins to contact the Respondent no later than January 6, 1998.

"d. A scheduling conference was eventually held on January 12, 1998. The Respondent and Mr. Jenkins did not appear at that hearing. The Respondent had been provided notification of the date of the scheduling conference. The Scheduling Order was sent to the Respondent and set out various deadlines in the case.

"e. A Motion to Dismiss was filed by the Department of Administration on June 1, 1998. The motion was based on the fact that Mr. Jenkins had not filed his suit in federal court within the ninety (90) day time period. The Respondent received notice of this motion and made no response to it. On July 1, 1998, Mr. Jenkins' case was dismissed by Judge Rushfelt because of Mr. Jenkins' failure to file suit within ninety (90) days.

"f. Communication by the Respondent with Mr. Jenkins was made difficult by the fact that Mr. Jenkins moved and often did not have a telephone. However, the Respondent failed to protect the interests of Mr. Jenkins once he was appointed to represent Mr. Jenkins in his discrimination action. The Respondent failed to appear at the scheduling conference. The Respondent failed to respond to the Motion to Dismiss. Alternately, the Respondent failed to withdraw from the representation of Mr. Jenkins if he could not properly represent him. Mr. Jenkins was not informed by letter that a Motion to Dismiss had been filed or that the Motion to Dismiss had been granted."

1. Coggs takes exception to the panel's finding that he failed to protect the interests of Mr. Jenkins once he was appointed to represent him.

The record shows that Coggs did not file a response to defendant's motion to dismiss his client's action, and the motion to dismiss was granted. Coggs testified that he did not respond because he believed the motion to dismiss was meritorious. He did not consult with his client nor did he attempt to withdraw as counsel.

2. Coggs states several other exceptions that he seems to concede are not material to any issue before the court. With regard to these exceptions, Coggs states that he "denies the implication that may be drawn" from them. Neither the exceptions nor the implications to be drawn from them are material.

### *Weber* Complaint

"3. a. Deanna Hadley Weber (the Complainant) worked as a clerk for Amoco in Kansas City, Kansas. On June 16, 1997, Ms. Weber sold cigarettes to a minor and was discharged from her employment. Ms. Weber filed a claim for unemployment benefits. Those benefits were initially denied by a hearing examiner. She filed an appeal of the examiner's decision. Shortly after filing the appeal, Ms. Weber hired the Respondent to represent her.

"b. A hearing on Ms. Weber's appeal was held on August 12, 1997. The Respondent represented Ms. Weber at that hearing. The hearing examiner's decision was reversed and Ms. Weber was awarded unemployment benefits. Amoco appealed that decision to the Employment Security Board of Review. Amoco was successful on the appeal. The Board disqualified Ms. Weber from receiving benefits, holding that Ms. Weber had acted in a careless and reckless manner in selling cigarettes to a minor. Ms. Weber was ordered to refund the unemployment compensation which had previously been paid to her.

"c. A copy of the Employment Security Board's decision was mailed to Ms. Weber and the Respondent on October 28, 1997. That decision had a statement printed on its face stating that Ms. Weber had sixteen (16) days to appeal the Board's finding to the District Court. Ms. Weber requested that the matter be appealed. The Respondent assured Ms. Weber that he would file a timely appeal. He failed to file the appeal. The Respondent informed the investigator of the disciplinary complaint that he 'did not intend to allow this deadline to slip by but it did.' "

Coggs filed no exceptions to the panel's findings of fact.

The panel concluded that the respondent violated KRPC 1.1 (1999 Kan. Ct. R. Annot. 284) in representing Ms. Cunningham's estate and trust in preparing the inheritance tax return; KRPC 1.3 (1999 Kan. Ct. R. Annot. 294) in representing Mr. Williams, Ms. Weber, Ms. Canady, and Ms. Cunningham; KRPC 1.4(a) (1999 Kan. Ct. R. Annot. 303) by failing to keep Mr. Jenkins informed of the status of his case; KRPC 1.5(a) (1999 Kan. Ct. R. Annot. 312) in the Cunningham estate by failing to timely file the inheritance tax return and billing the estate for unnecessary expenses; KRPC 1.7(a) (1999 Kan. Ct. R. Annot. 321) by recommending to

Ms. Cunningham that Ms. Holland serve as trustee; KRPC 1.8(b) (1999 Kan. Ct. R Annot.. 325) and KRPC 1.7(b) by borrowing $7,000 from Ms. Cunningham's trust without first obtaining her consent and failing to repay the loan; KRPC 8.4(g) (1999 Kan. Ct. R. Annot. 399) for his conduct in the Cunningham case.

The first issue is whether the panel's finding that Coggs violated KRPC 1.3 is supported by clear and convincing evidence.

KRPC 1.3 (1999 Kan. Ct. R. Annot. 294) provides: "A lawyer shall act with reasonable diligence and promptness in representing a client." Respondent stipulated that he violated KRPC 1.3 as to his representation of Weber and Williams. As to Canady, he admits that "there was substantial delay" in the probate of his client's father's estate. He asserts that the delay was due to factors outside his control.

The evidence showed that Coggs was retained in May 1994 and that by June 1997 the only step that had been taken toward closing the estate was getting his client appointed administrator. The evidence does not show that other persons' conduct prevented timely disposition of the estate or relieved Coggs of his responsibility to act with reasonable diligence and promptness.

In the Cunningham estate, respondent took 20 months to improperly calculate the inheritance tax, costing Ms. Cunningham's estate nearly $3,000 in interest. Additionally, after respondent learned that the assets of Ms. Cunningham's trust had been depleted, he failed to even attempt to recover the assets.

We hold there is clear and convincing evidence respondent violated KRPC 1.3.

We next consider if the panel's finding that Coggs violated KRPC 1.1 is supported by clear and convincing evidence.

KRPC 1.1 (1999 Kan. Ct. R. Annot. 284) provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Coggs does not deny making mistakes in his representation of Cunningham. He asserts that his acts or omissions were, at most, inadvertence, which does not rise to the level of incompetence in violation of KRPC 1.1.

The evidence showed that Coggs calculated the inheritance tax on the original trust fund amount rather than on the amount of trust assets at the time of Cunningham's death. The error was made on a part of the Kansas Inheritance Tax Return form that conspicuously states that the dollar amount entered should be the "Value at Date of Death." Coggs testified that he did not check with the trustee to learn the amount of the trust assets at the time of Cunningham's death. His failure to do so cost the estate and trust thousands of dollars.

Coggs asserts that his mistake was advantageous to his client because he failed to take generated income into account. He cites no evidence in the record that would support his assertion. The record reflects that the trust assets had been nearly drained by the time of Cunningham's death. The hearing panel found that the trust assets had been depleted to the point that the inheritance tax of approximately $17,000 could not be paid from them. The evidence is clear and convincing that respondent violated KRPC 1.1.

The next issue is whether the panel's finding that Coggs violated KRPC 1.5(a) is supported by clear and convincing evidence.

KRPC 1.5(a) (1999 Kan. Ct. R. Annot. 312) provides that "[a] lawyer's fee shall be reasonable." The hearing panel concluded that Coggs' fees for handling the Cunningham estate were unreasonable "[b]ecause the Respondent's failure to timely file the inheritance tax return cost the estate an additional $3,000.00 and because it appears that the Respondent billed the estate for unnecessary expenses . . . ."

Coggs relies on the district court's approving his fee request as reasonable. The panel took the district court's determination into consideration, but reached a different determination based on information that was not available to the district court—that Coggs' delay in filing the tax return cost the estate approximately $3,000. In addition, the panel expressed concern that Coggs expended a great deal more time on the inventory than was called for. In this respect, the information available to the panel and the district court was the same. We conclude the panel's finding is supported by clear and convincing evidence.

We next consider if the panel's finding that Coggs violated KRPC 1.7(a) and (b) is supported by clear and convincing evidence.

The panel concluded that Coggs violated KRPC 1.7(a) by appointing one client, Michelle Holland, to serve as trustee of the trust of another client, Frances Cunningham. The panel described the resulting situation as one "where two of his clients developed directly adverse interests." Coggs asserts that he did not represent Holland at the time Cunningham's trust was created. He admits that he did not tell Cunningham that Holland had been his client. He blames Holland for creating a conflict by misappropriating the trust funds.

The panel concluded that Coggs violated KRPC 1.7(b) by taking an unsecured and unconsented to loan from Cunningham's trust assets. The panel concluded that it was unlikely that Coggs "would file suit as attorney for the estate against himself to collect that debt." Coggs asserts that he will repay the loan. However, he has not reported the loan or the interest which has accrued since June 1993. We agree with the panel's findings.

The next issue is whether the panel's finding that Coggs violated KRPC 1.8(b) is supported by clear and convincing evidence.

KRPC 1.8(b) (1999 Kan. Ct. R. Annot. 325) provides that "[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 or Rule 3.3." The factual basis for the panel's determination that Coggs violated KRPC 1.8(b) is the same as for the violation of KRPC 1.7(b)—his borrowing money from the trust assets. In the panel's view, Coggs used his knowledge of Cunningham's trust assets in obtaining $7,000 for himself without her consent.

Respondent argues that the trust beneficiaries were not disadvantaged by the loan. It appears that his position is that he will repay the loan with interest so that the beneficiaries will be made whole. We find no merit in respondent's position and find the violation of KRPC 1.8(b) is supported by clear and convincing evidence.

The next issue is whether the panel's finding that Coggs violated KRPC 8.4(g) is supported by clear and convincing evidence.

KRPC 8.4(g) (1999 Kan. Ct. R. Annot. 399) provides: "It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law." The panel based its determination that Coggs violated KRPC 8.4(g) on his appointing Holland to serve as trustee and his borrowing money from the trust assets. With regard to Holland's appointment, the panel emphasized that Coggs knew "Holland had recently been personally bankrupt," but failed to advise Cunningham of that fact or that Holland was his client.

Coggs states that Holland's bankruptcy was in 1989. The Cunningham trust was established in April 1992. He states: "There is no evidence that a bankruptcy disqualifies one from being a trustee," and "there is no standard as to how long one must bear the cross of bankruptcy." Respondent completely misses the point. We find the violation of KRPC 8.4(g) is proven by clear and convincing evidence.

We next consider if the panel's finding that Coggs violated KRPC 1.4(a) is supported by clear and convincing evidence.

KRPC 1.4(a) (1999 Kan. Ct. R. Annot. 303) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." The panel based its determination on respondent's failure to inform Jenkins that a motion to dismiss his action had been filed and that the motion to dismiss had been granted.

Coggs offers two justifications for failing to tell Jenkins about the motion to dismiss his action. First, he contends that his client failed to communicate with him. Second, he contends that he explained to Jenkins from the outset that his action was subject to dismissal absent some reason why the statute of limitations should be tolled and that Jenkins never supplied a reason. Neither is justification for doing nothing. Coggs may have had justification to withdraw as counsel for Jenkins, but he never did attempt to do so. We conclude there is clear and convincing evidence that respondent violated KRPC 1.4(a).

Finally, respondent raises two additional issues in his brief. First, he contends he was deprived of his constitutional right to have members of his race as members of the Kansas Board for Discipline of Attorneys or the review committee. Second, he disputes the panel's finding that he presented no evidence of "disparate treatment" by the Kansas Board for Discipline of Attorneys.

The Disciplinary Administrator responds that Coggs has waived or abandoned these issues by failing to argue or brief them. The cases he cites are civil cases rather than discipline cases. However, we know of no reason why the brief-it-or-lose-it rule should not be applied in the review of a disciplinary case. Respondent has raised the issue of discrimination but fails to direct this court to any evidence in the record to support his claim and makes no argument nor cites any authority to support his claim. We simply have no bases to consider the merits of respondent's claim. We, therefore, decline to consider the two issues raised but not briefed.

In making its recommendation for discipline, the panel considered the factors identified by the American Bar Association in its Standards for Imposing Lawyer Sanctions—the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

Duty violated. The panel stated: "[T]he Respondent violated his duty to provide competent and diligent representation, his duty to communicate with his clients, his duty to the profession, and his duty to avoid conflicts of interest."

Coggs filed no exceptions to the panel's determination of duty violated.

Mental state. The panel stated: "In regard to the Williams case (DA7274) and the Weber case (DA7439), the Respondent's actions or inactions were the result of negligence. However, the Respondent intentionally engaged in misconduct in the Cunningham case (DA7204), the Jenkins case (DA7328), and the Canady case (DA6881)."

Coggs filed unelaborated exceptions to the panel's findings of intentional misconduct. He did not direct the court's attention to any evidence in the record. His only statement beyond strict denial

of intentional misconduct was to deny that "[b]ecause Respondent failed to communicate with [Jenkins] he was unaware that his suit had been dismissed."

Injury. With regard to this factor, the hearing panel stated:

"The Respondent's misconduct resulted in actual injury to each of his clients. In the Williams case (DA7274), Mr. Williams lost his cause of action because the Respondent failed to obtain service of process. In the Weber case (DA7439), Ms. Weber lost her right to appeal the Employment Security Board of Review's decision because the Respondent failed to file her appeal. In the Cunningham case (DA7204), Ms. Cunningham's estate was injured financially. The amount of loss that the Respondent caused is difficult to assess. Certainly, the estate lost the $7,000.00 that the Respondent borrowed. The Respondent cost the estate thousands of dollars by improperly calculating the inheritance tax. The Respondent calculated the inheritance tax based on the assets transferred to the trust during Ms. Cunningham's life, rather than the assets in the trust at the time of Ms. Cunningham's death. Because the value of the trust at the time of Ms. Cunningham's death is not in evidence, it is impossible to assess the extent of injury in this regard. Additionally, because the Respondent took twenty (20) months to (improperly) calculate the inheritance tax, the estate paid an additional $2,927.02 in interest. Finally, it is arguable that the estate lost all of the trust assets because of the Respondent's recommendation that Ms. Holland serve as the trustee. Mr. Jenkins (DA7328) was also injured by the Respondent's misconduct. Because the Respondent failed to communicate with Mr. Jenkins, Mr. Jenkins was unaware that his suit had been dismissed. Finally, Ms. Canady (DA6881) was injured by the Respondent's inaction with regard to Ms. Canady's father's estate. During the three years that the Respondent failed to take any action, according to Ms. Canady, the personal property of the decedent was disposed of by Ms. Canady's step-mother.

"The Hearing Panel concludes that the Respondent's misconduct caused actual injury to each of the clients."

Aggravating or mitigating factors. Before setting out the hearing panel's remarks in full, it is noted that Coggs filed a number of exceptions to them. In no instance, however, did Coggs direct the court's attention to evidence that would support the exception.

The hearing panel stated:

"In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Dishonest or Selfish Motive. With regard to the Cunningham complaint (DA7204), the Hearing Panel finds that the Respondent's misconduct is the result of a dishonest or selfish motive. The Respondent did not have the best interests

of his client, Ms. Cunningham, in mind when he borrowed $7,000.00 from her trust. Moreover, he has yet to repay the monies.

"Pattern of Misconduct. When considering the Williams complaint (DA7274), the Weber complaint (DA7439), the Cunningham complaint (DA7204), the Jenkins complaint (DA7328), and the Canady complaint (DA6881), it is apparent that the Respondent engaged in a pattern of misconduct.

"Multiple Offenses. By violating KRPC 1.1, 1.3, 1.4(a), 1.5(a), 1.7, 1.8(b), and 8.4(g), the Respondent committed multiple offenses.

"Deceptive Practices During the Disciplinary Process. Often when being examined by the Disciplinary Administrator or by members of the Hearing Panel, the Respondent was reluctant to provide complete answers. Additionally, the Respondent provided conflicting testimony. For example, the following exchange occurred between the Disciplinary Administrator and the Respondent:

"Q. Had you ever represented [Ms. Holland] in any legal matters?

"A. Might have represented her in a matter, in a bankruptcy or something like that.

"Q. That was prior to the time you drafted the will and the trust for Ms. Cunningham?

"A. I would have to go back to look. I don't know as to the time table.

"Q. I understand, but your best recollection is that you represented her in a bankruptcy, her bankruptcy at some point in time. Are there any other matters that you represented her in?

"A. Not that I can recall."

Later, the Hearing Panel questioned the Respondent as follows:

"Q. (By Mr. Ramirez) Let's try that again. Tell me about your representation of Ms. Holland. When was it, and what was the nature of your representation?

"A. Primarily in bankruptcies, I believe.

"Q. I beg your pardon?

"A. Primarily in bankruptcies.

"Q. Had she filed bankruptcy before?

"A. Not prior to this point in time, I don't believe. Somewhere in close proximity to—either it was after—after she was trustee, she filed a personal bankruptcy, I believe.

"Q. Did you represent her in the bankruptcy proceedings?

"A. I believe I did.

"Q. And you prepared her schedule of assets and debts?

"A. Right.

"Q. Did you include in her bankruptcy schedules information about her management of a trust account?

"A. No.

"Q. Did you inform Ms. Cunningham that she had filed a personal bankruptcy?

"A. I believe Ms. Cunningham had died by that time.

"Q. When was the bankruptcy filed?

"A. Sir, I can't tell you. I'd have to go back and check my records as to when that was.

"Q. But you believe it was after Ms. Cunningham's death?

"A. I believe so.

"Q. Which was '94?

"A. Right.

. . . .

"Q. Did you, other than the bankruptcy, do any other legal work for [Ms. Holland]?

. . . .

"A. I don't believe so. There might have been an incorporation of some business that she might have incorporated with some other person."

Then, the following day, when questioned by his attorney regarding the same subject matter, the Respondent provided the following information:

"Q. Mr. Coggs, going back to the Cunningham matter for just a moment. Last night, did we go through some stuff at your office looking for some materials that might be responsive to the inquiries that were made yesterday?

"A. Yes.

"Q. And did you find at least one bankruptcy filing that you had for Ms. Holland?

"A. Yes, I did.

. . . .

"Q. And when was that filed?

"A. Well, 158 is a statement of financial affairs and Schedules A through J. That was filed July 30th of 1997. I think the voluntary petition was filed sometime before that.

. . . .

"Q. (By Mr. Fields) I believe yesterday you testified that you had done some other work for her from time to time.

"A. That's correct.

"Q. Does this Exhibit 159 reflect at least some of the other work you have done for her?

"A. That's correct.

"Q. And in what format had you kept this?

"A. When we opened a file, we have basically a card that has four or five copies to it, and this is the back cardboard part of that file.

"Q. So, these are kept in a card file?

"A. Right.

"MR. FIELDS: We would offer 159.

"MR. HAZLETT: No objection.

"MR. RAMIREZ: 159 will be received.

"Q. (By Mr. Fields) And are you necessarily representing that these are all the matters that you handled for her?

"A. No.

"Q. Or just the ones that you were able to find last evening in the card file?

"A. These are the ones I was able to find, plus the bankruptcy in 158.

"Q. And you're not representing, are you, that's the only bankruptcy you filed, that's just the earliest one that you could find?

"A. That's correct."

Later, the Respondent acknowledged that he may have filed a bankruptcy on behalf of Ms. Holland earlier than 1997.

"The Hearing Panel—upon receiving the records of the United States Bankruptcy Court—learned that the Respondent had represented Ms. Holland in three bankruptcy cases. In 1989, the Respondent filed a Chapter 7 bankruptcy on behalf of Ms. Holland. Through that proceeding, Ms. Holland was able to discharge nearly $400,000.00 in debt.

"On July 8, 1997, the Respondent filed a Chapter 13 bankruptcy in behalf of Ms. Holland. That case was dismissed on September 16, 1998, because Ms. Holland was in default on payments and the plan was not feasible.

"Then, on October 9, 1998, the Respondent filed a Chapter 13 bankruptcy in behalf of Ms. Holland. Again, that case was dismissed because Ms. Holland defaulted on the plan payments.

"In addition to representing Ms. Holland in those three bankruptcies, the Respondent also represented Ms. Holland in at least six (6) other matters, spanning from the 1980s through 1998.

"It is of particular significance to the Hearing Panel that the Respondent never disclosed to the Hearing Panel, or to his client, Ms. Cunningham, the fact that he had personally represented Ms. Holland in the 1989 bankruptcy. This certainly casts doubt upon the merits of designating Ms. Holland as Trustee of the Phillips Family Trust and demonstrates a lack of candor on the part of the Respondent during the disciplinary process.

"Refusal to Acknowledge the Wrongful Nature of Conduct. Throughout the proceedings, the Respondent refused to acknowledge the wrongful nature of his misconduct with regard to the Cunningham case (DA7204), the Jenkins' case (DA7328) and the Canady case (DA6881). However, the Respondent did admit that he violated KRPC 1.3 with regard to the Williams case (DA7274) and the Weber case (DA7439).

"Regarding the Cunningham complaint, the Respondent testified that it was proper for him to borrow money from Ms. Cunningham's trust. Furthermore, the Respondent refused to acknowledge that Ms. Cunningham and/or her trust has suffered by his failure to repay the money. Additionally, the Respondent refused to acknowledge that he failed in his duty to communicate with Mr. Jenkins. The Respondent excused his failure to communicate with Mr. Jenkins, because Mr.

Jenkins was difficult to locate. Finally, the Respondent refused to acknowledge that he acted improperly, despite the incredible delay, in settling the estate of Ms. Canady's father.

"The Cunningham case is particularly troubling to the Hearing Panel and the Respondent's demeanor and testimony demonstrated a fundamental lack of concern for the ethical considerations that should have governed the self-dealing transactions. He justified these transactions by indicating that he would be paying interest under the loan. But he has failed for some time, to pay the loan and the interest that his client, Ms. Holland, and he 'negotiated.' Additionally, the transactions were not arms-length transactions. A prudent lender would not have assigned such a rate of interest given the credit risk that the Respondent presented and the lack of collateral.

"Vulnerability of Victim. The victim in the Cunningham complaint (DA7204) was vulnerable. At the time the Respondent prepared the will and the trust, Ms. Cunningham was 90 years old. Ms. Cunningham trusted the Respondent with all of her assets and the Respondent placed those assets in the hands of someone with no experience as a trustee and who he had, just three (3) years earlier, represented in a bankruptcy action.

"Substantial Experience in the Practice of Law. The Respondent was admitted to the practice of law in the state of Wisconsin in 1974. Subsequently, in 1977, he was admitted to the practice of law in the state of Kansas. At the time the misconduct began, the Respondent had been practicing law for eighteen (18) years.

"Indifference to Making Restitution. The Respondent has shown no interest in making restitution to any of the victims in this case. The Respondent has vaguely indicated that he is going to repay the loan from Ms. Cunningham's trust. However, he has not developed a specific plan to do so.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:[3]

[FOOTNOTE 3: "The Respondent testified that prior to borrowing the $7,000.00 from Ms. Cunningham's trust, the Respondent had suffered a back injury which prevented him from working to the extent necessary to provide for himself and his family. While this was not presented by the Respondent or his counsel as a mitigating factor, the Hearing Panel acknowledges that testimony.]

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined.

"Previous Good Character and Reputation in the Community Including Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. The Respondent is an active and productive member of the bar in Kansas City, Kansas. He enjoys the respect of his peers and clients and generally possesses a good character and reputation as evidenced by several letters received by the Hearing Panel.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered Standard 4.32. That standard provides:

Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

In the Cunningham case, the Respondent knew (or should have known) that it was a conflict of interest (1) to recommend that Ms. Holland act as Ms. Cunningham's trustee because (a) Ms. Holland was the Respondent's client and (b) he represented Ms. Holland in a bankruptcy proceeding, (2) to borrow money from Ms. Cunningham's trust because Ms. Cunningham was the Respondent's client, and (3) to settle the estate on behalf of Ms. Cunningham's estate when the Respondent was a debtor of the estate, having failed to repay the loan according to the provisions of note.

"The Respondent did not consult with Ms. Cunningham prior to seeking the loan. There is no evidence that Ms. Cunningham was ever made aware of the fact that the Respondent had borrowed $7,000.00 from her estate. Additionally, the Respondent did not disclose to Ms. Cunningham that Ms. Holland had recently been personally bankrupt nor that Ms. Holland was the Respondent's client. Finally, the Respondent did not, in any of the pleadings filed in district court, disclose that he had borrowed $7,000.00 from the Phillips Family Trust or that he had failed to repay the loan according to the terms of the note. As detailed above, the Respondent's actions caused significant injury."

The question is not whether suspension is proper, but the length of the suspension. Respondent's conduct demonstrates a disregard of his duty to his clients and the court. All the complainants suffered injury as a result of respondent's conduct. Respondent's unethical conduct continued for an extended period of time. His violations of the KRPC were serious and numerous and resulted in extensive injury to his clients. After a careful review of the record, we conclude that the conduct of the respondent and the nature and number of violations require that he be indefinitely suspended from the practice of law in Kansas, to be effective as of the date of this order.

IT IS THEREFORE ORDERED that Gregory M. Coggs be and he is hereby indefinitely suspended from the practice of law in Kansas.

IT IS FURTHER ORDERED that Gregory M. Coggs comply with Supreme Court Rule 218 (1999 Kan. Ct. R. Annot. 250), that he pay the costs of this action, and that this order be published in the official Kansas Reports.