IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,910

In the Matter of DAVID P. CRANDALL,
*Respondent.*

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed November 30, 2018. Six-month suspension.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause, and *Deborah L. Hughes*, Deputy Disciplinary Administrator, was with him on the brief for petitioner.

*David P. Crandall*, respondent, of Creative Planning Legal, P.A., of Leawood, argued the cause pro se and was on the brief for respondent.

PER CURIAM:  This contested attorney discipline proceeding arises out of two separate matters handled by David P. Crandall. After the Disciplinary Administrator filed a formal complaint, the chairman of the Board for Discipline of Attorneys appointed a hearing panel. The hearing panel conducted an evidentiary hearing, at which Crandall appeared in person and through counsel. The panel later issued its final hearing report in which it concluded Crandall violated six provisions of the Kansas Rules of Professional Conduct (KRPC):  KRPC 1.1 (2018 Kan. S. Ct. R. 289) (competence), KRPC 1.3 (2018 Kan. S. Ct. R. 292) (diligence), KRPC 1.4(b) (2018 Kan. S. Ct. R. 293) (communication), KRPC 1.5(a) (2018 Kan. S. Ct. R. 294) (fees), KRPC 1.7(a) (2018 Kan. S. Ct. R. 302) (concurrent conflict of interest), and KRPC 8.4(d) (2018 Kan. S. Ct. R. 381) (conduct prejudicial to the administration of justice). The panel majority recommended this court suspend Crandall from the practice of law for a period of six months. A dissenting voice would have imposed a one-year suspension.

1

Before this court, Crandall contests many of the panel's factual findings and raises several legal arguments. To begin with, he challenges this court's subject matter jurisdiction over one of the complaints. Crandall, who was licensed in Kansas in 1999, later received licenses to practice law in Missouri and California. He argues the Kansas Supreme Court has no say when his clients were residents of Missouri and he was acting under his Missouri license. He also contends the imposition of discipline would result in violations of the First and Fourteenth Amendments to the United States Constitution, the disciplinary hearing panel erred in not admitting investigators' reports at the disciplinary hearing, and the panel's conclusions that he violated various rules of professional conduct are unsupported by clear and convincing evidence.

As fully detailed below, after reviewing each instance of misconduct found by the panel, we find clear and convincing evidence Crandall violated the six provisions of the Kansas Rules of Professional Conduct as found by the hearing panel. In assessing discipline, we consider the facts and circumstances of each violation; the ethical duties Crandall violated; the knowing nature of his misconduct; the injury resulting from his misconduct; any aggravating and mitigating factors; and the applicable American Bar Association (ABA) Standards for imposing discipline. After applying this framework, a majority concludes Crandall's misconduct warrants a six-month suspension. A minority would impose a lesser punishment.

FACTUAL AND PROCEDURAL BACKGROUND

The formal proceedings began against Crandall when the Disciplinary Administrator received a letter questioning the reasonableness of a fee Crandall charged for updating an estate plan. The Disciplinary Administrator treated the letter as a complaint and docketed it for investigation, assigning docket number DA11921.

2

While DA11921 was pending, a Johnson County district court judge forwarded a copy of the judge's order rejecting most of Crandall's requested fees in a probate matter in which Crandall represented an executor and successor executor of an estate. The Disciplinary Administrator docketed the order as a complaint against Crandall, assigning docket number DA12304.

A hearing panel heard evidence relating to the two complaints over two days and subsequently released a 67-page Final Hearing Report. Crandall filed timely exceptions to the report under Supreme Court Rule 212 (2018 Kan. S. Ct. R. 255). He later filed a timely brief explaining his disputes with the hearing panel's findings of fact and conclusions of law.

As we review Crandall's arguments, we begin with the panel's findings of fact in which the panel addressed each complaint separately.

*Crandall's estate planning for B.A. and V.A. in DA11921*

The first complaint, DA11921, arises out of Crandall's representation of a married couple, B.A. and V.A. They were residents of Missouri at the time of Crandall's representation.

Crandall first represented B.A. and V.A. in 2007, while he was with a law firm. At that time, he updated their estate plan for a fee of $900. Later, he left the firm and established his solo practice, locating his office in Kansas. The hearing panel made the following findings of fact about Crandall's contact with the couple and the services he charged for work he subsequently performed:

"19. In October, 2008, the respondent sent a 15 page letter to B.A. and V.A. In the letter, the respondent informed B.A. and V.A. that he had become affiliated with the National Network of Estate Planning Attorney's [*sic*] and the Family Wealth Planning Institute and had changed the way he does estate planning. The respondent conducted an analysis of their current estate plan. To conclude the letter, the respondent encouraged B.A. and V.A. to attend a workshop for prospective clients.

"20. In 2012, when B.A. and V.A. were in their late 80s and after V.A. had developed significant memory problems, B.A. and V.A. again retained the respondent to update their estate plan. On May 7, 2012, B.A. and V.A. entered into an estate planning engagement letter, a deliberate legacy services addendum, and a long-term care planning services addendum with the respondent. Because of the dementia, V.A. was unable to understand the documents and B.A. signed the documents on her behalf.

"21. The respondent included the following regarding his legal fees, in the engagement letter:

'Legal Fees:  The legal fee for each service requested is described in each respective Services Addendum. Most of our services are provided on a fixed fee basis with portions of the fee payable at various times during the process as scheduled in the respective Services Addendum. When a fee is paid, it is for services rendered to that point, and is not refundable. We are responsible to start drafting legal documents or to do whatever other services are described only when we negotiate (deposit) your first payment/check.

'If you terminate our representation no later than 3 days after payment of the first fee under the Services Addendum, then we will not charge the balance of the fee. After that, however, we will quickly invest substantial time toward implementing your plan, and will expect you to pay the balance of the fee and accept the services.

4

'Payments are due when billed. Unpaid balances due for more than thirty days are subject to a service charge of 1.5% per month.'"

B.A. and V.A. had assets valued at $472,479, and they hoped to protect their assets from the expenses of long-term care so their children would have an inheritance. Crandall realized that B.A. and V.A. could be eligible for Veterans Administration Aid and Attendance benefits. Crandall established two trusts, an irrevocable one (the veterans eligibility trust) and a revocable trust (the deliberate legacy trust) funded with just under $80,000—the approximate amount of estate a veteran could have and still be eligible for veterans benefits. The revocable trust was 130 pages in length. Crandall designed these trusts to make the couple immediately eligible for veterans benefits and eventually for Medicaid benefits after the expiration of the five-year look-back period for divestiture of assets. Each child would receive an equal share (about $15,000) that would be held in trust for the next generation (a generation skipping trust). Crandall also drafted a power of attorney and a pour-over will naming the revocable trust as B.A.'s beneficiary upon his death. Crandall testified he created the documents by using the software provided by the National Network of Estate Planning Attorneys.

Disagreements between the couple's children resulted in changes to the trustee of one of the trusts. One of the children asked another attorney, Deborah McIlhenny, whether Crandall's fee was reasonable. McIlhenny, who does not routinely handle estate matters, consulted with an estate lawyer who said the fee was much too high. McIlhenny sent a letter to the Disciplinary Administrator raising her concerns.

The Disciplinary Administrator asked another attorney, Philip D. Ridenour, to review the reasonableness of the fee. Ridenour concluded the revocable trust Crandall drafted was needlessly complex. Ridenour thought the reasons for this could be (1) Crandall used a form; (2) Crandall lacked experience or expertise to evaluate the couple's

5

existing trust and to understand it was adequate for their needs; or (3) to justify his fee. Ridenour knew no other estate planning lawyer who would have suggested the generation skipping trust Crandall established. According to Ridenour, the trust corpus did not support the fees required to administer the trust over the years it could pay benefits to the five beneficiaries, who had life expectancies of another 30 to 40 years.

The hearing panel quoted Ridenour's report in which he laid out the confusing nature of the fee agreement:

"'None of the documents I have reviewed show any breakdown between fees charged for preparation of the revocable trust and the veterans' trust.

"'Mr. Crandall's comments as to how his fees are to be calculated are confusing.

"'At Exhibit 3 page 30, Mr. Crandall in his Estate Planning Engagement Letter states:

"''Estimated Estate Value: The fees charged and the planning recommended are based upon your *estimated gross estate value*."

"'That statement seems to be at odds with the statement on Exhibit 3, page 34 of the same letter:

"''Legal Fees: The legal fee for each service requested is described in each respective Services Addendum. Most of our services are provided on a *fixed fee basis* with portions of the fee payable at various times during the process as scheduled in the respective Services Addendum."

"'It is also difficult to know quite what services are covered by the "flat fee." At page 2 of his letter of November 7, 2014, to Stan Hazlett, . . . Mr. Crandall's lawyer []

6

represents "(i) this was a fixed fee and not hourly, (ii) the fee included *unlimited legal advice before execution of the estate planning documents and continuing after execution, for a period of three (3) years*; (iii) the fee included implementation of the plan, including funding/transferring of assets into the trusts, and (iv) the fee included regular plan maintenance and review of client objectives and changes in the law. All of these services are to be provided to [B.A. and V.A.] over a three (3) year period following execution at no additional charge."

"'That is consistent with Mr. Crandall's statement appended to [his attorney's] letter, at page 3:

"""When this firm is engaged for these services, we commit to *three years of counseling* (both with the client and with designated helpers), implementation, and *revision of the plan without any additional fee*."

"'But both of those statements appear inconsistent with Mr. Crandall's statement in his Engagement Letter, Exhibit 3, page 34:

"""<u>Changes in Design</u>; <u>Unusual Costs</u>:  Our fee quotation is for the plan designed in the planning meeting. *Changes to plan design may involve additional fees*. We will notify you promptly if design changes will result in additional charges. If changes are necessary because of incomplete or inaccurate information you provide, new assets or increased values associated with the existing assets, etc., there will be additional fees. Therefore, it is essential that you give us complete and accurate information at the outset.

"""If your planning involves unanticipated costs, such as *excessive consultation time* with your other advisors, or out-of-pocket expenses incurred for you (like unanticipated long distance telephone calls, express mail, etc.) we will charge you for those costs."

7

"'The representation by [Crandall's attorney], along with the attached comment by Mr. Crandall suggests that both unlimited legal advice and revision of the estate plan for a period of three years are covered by and included within the flat fee, while Mr. Crandall's Engagement Letter states that changes to the estate plan and "excessive consultation time" will incur additional charges.

"'Perhaps these apparently contradictory statements regarding fees can all be reconciled, but since I find them confusing and conflicting, it seems reasonable to assume that [B.A.] would also have found them to be confusing.'"

The hearing panel agreed, finding:

"22. Under the agreements, B.A. and V.A. were to pay $27,586.00 for long term care planning services and $3,440.00 for deliberate legacy services, for a total of $31,026.00. The respondent's Services Addendums are confusing. It is difficult to tell what each fee relates to. (As an aside, it is important to note that under federal law, it is a crime to charge a veteran or their spouse to apply for veterans' benefits.) From the exhibits presented, it appears that B.A. and V.A. paid $25,855.00 of the agreed amount to the respondent between May, 2012, and October, 2012."

The Disciplinary Administrator also asked Stacey Janssen, an estate planning attorney in the Kansas City area, to review Crandall's work. Janssen felt Crandall had appropriately established the veterans eligibility trust. But, like Ridenour, she criticized the 130-page deliberate legacy trust. She felt many provisions were unnecessary and "complete overkill." She expressly criticized the lifetime legacy (or protective) trusts established for each of the couple's children. Janssen also testified about fees typically charged in the Kansas City area. She stated that most estate planning lawyers would have charged $3,000 to $8,000 for similar services. Janssen also testified she would not have taken the representation because there was disagreement among the children. She saw the disagreement as a red flag suggesting complications were likely, including an increased

8

risk for a potential disciplinary complaint. She also agreed that the disagreement may have required more time being spent on the matter.

Crandall presented David Kerr as an expert who offered his opinion that Crandall's fees were reasonable. The hearing panel quoted Kerr's testimony at length. In that testimony he told the panel he was familiar with the type of engagement agreement Crandall had offered B.A. and V.A. because he used it at times. He testified attorneys often used the agreement with elderly people who, as a group, have a tendency not to "'call the lawyer because they're concerned about getting charged with a telephone call. And so when you have a fixed price contract with an agreed period of service and a description of the services then they feel free to call.'" He felt it was an appropriate arrangement for V.A. and B.A.'s situation. He also observed that when you agree to offer services for three years, "'you haven't got a clue as to what [the future issues or questions are] going to be, but you are prepared to do it and you're prepared to help the family and help them not make mistakes.'" He also testified Crandall developed an appropriate plan for V.A. and B.A. Specifically,

> "'by applying to VA benefits it expanded the amount of money available . . . . [Crandall] put a significant amount of assets into that trust, but then preserved them. Then [B.A.] was eligible for his $900 a month which could help pay for assisted living along with their other assets. But it did more than that, okay. It's integrated, okay. So it's not just one thing. You're thinking, okay, what can happen in the future. By establishing that discretionary trust, what I call a lock box trust, for [B.A. and V.A.] and putting their assets in it, if they go for five years then at the end of five years none of those assets will be counted as a divestment for purposes of qualifications of Medicaid. That will occur in November of possibly 2017, so about a year from now. So in doing that he not only helped qualify him for VA, but he also set it up that as time passed there would be eligibility for Medicaid and no divestment penalty. So I saw that as integrated. . . . What I saw is economic benefit from doing this.'"

Kerr also testified that V.A. also benefited because "'she was the widow and the successor. And, as I recall, because Mr. Crandall then did work for her at no cost in terms of the application. I think she qualified to get $1,100 a month'" for her lifetime. This means Kerr "'saw the plan as being worth more than $478,000. [He] saw it as enhanced by the revenue that—what Mr. Crandall did to supply it and under the three-year agreement by being available to provide additional services to enhance then what [V.A.] would receive.'"

He also testified there was a benefit to the revocable trust because it protected the children and secured the funds

> "'from divorcing spouses. If they got sick and needed social benefits, the monies in there wouldn't disqualify them for that. If they were in a really bad accident and were at fault and had a big judgment against them, all the assets in there would be protected. And so I saw that as integrated. And so I thought what he did was appropriate but unappreciated because people don't look at it that way.'"

Kerr stated he felt the attorney fees charged V.A. and B.A. "'were very reasonable.'" In Kerr's view, given the veterans benefits and the potential for future benefits "'economically speaking it was worth it.'"

Both Kerr and Crandall continually emphasized that Crandall's services were unique. Crandall pointed to specific provisions, such as a requirement in the durable power of attorney document for a panel of individuals to determine disability. He also cited the three years of ongoing counseling and what he called a no-probate guarantee. Finally, he suggested other attorneys were only interested in getting enough client information to complete forms, used one-size-fits-all forms, and sent the clients home to fend for themselves.

10

Ridenour and Janssen took a different view. For example, Janssen testified she spends a significant amount of time discussing the client's goals; visiting with the client and his or her family; and learning of health issues, the family dynamic, and caregivers. The estate plan is then tailored to the specific goals and needs. And, after her client signs the documents, she continues to work with the client to be sure assets are transferred to trusts and other details are completed. In addition, her flat fee includes post-execution meetings with the fiduciary, as needed, and continuing to answer questions that might arise.

*Crandall's representation of Anthony and A.L. as executors in a probate action arising out of their mother's death, DA12304*

Anthony L. hired Crandall to represent him as executor of his mother's, M.L.'s, estate. The estate was initially valued at approximately $71,000, of which $70,000 was attributable to M.L.'s residence. M.L. had owned the residence since 1978. Both Anthony and A.L. lived there with their mother for many years and continued to live there when M.L. was in a nursing home and after her death. A.L. paid off the mortgage on the house in 2007.

Before her death, M.L. executed two different deeds transferring the same piece of real property—her residence. M.L. first executed a deed under which she owned the property as a joint tenant with right of survivorship with her two daughters. If enforced, the property passed to the daughters outside of M.L.'s estate. Under the later deed, the property passed to a trust.

Crandall filed a petition for probate of M.L.'s will and sought the issuance of letters testamentary on behalf of Anthony in September 2007. M.L.'s daughters filed defenses to the admission of the will in November 2007. Benjamin Sherber, representing the Kansas Estate Recovery Program, filed a petition for allowance and classification of a

demand seeking to recover medical assistance the State had provided through Medicaid. The claim was for $216,619.39. A scheduled November 2007 hearing was continued. No court action appears to have taken place from sometime in 2007 until 2009.

The next activity in the estate case occurred because Anthony died. In March 2009, Crandall petitioned for allowance of attorney fees and expenses and moved to withdraw. A.L., Anthony's brother, retained Crandall to represent him as successor executor of the estate. In April, Crandall entered his appearance on behalf of A.L., withdrew his request for attorney fees and expenses, and filed a second petition for probate of M.L.'s will and issuance of letters testamentary.

Nothing else happened in the estate proceeding until August 2011. Crandall's billing records show little activity over this two-year period. In 2010, he only billed 2.8 hours, all in the month of April. But in an exhibit Crandall submitted to the hearing panel, he reported working on the case in other months. He did little in the first half of 2011, billing 2.8 hours through June of that year. His billing picked up significantly in July and August of 2011 when Sherber filed a petition to set aside the two deeds M.L. executed before she died. Shortly after, the court admitted the will to probate and issued A.L. letters testamentary.

In November 2011, the court issued an order setting aside the deeds. The order, drafted by Sherber, stated that the house was not a homestead. Crandall's and Sherber's testimony differed in describing how the homestead language became part of the order, and the hearing panel indicated it found Sherber to be more credible. Sherber explained he added the homestead language and it was not ruled on nor discussed at the in-chambers meeting with the district court. Sherber also testified he included the language based on a similar document he drafted in the past; it was not the result of any negotiation he had with Crandall.

Crandall did not discuss the contents of the order with A.L. before approving it, even though he knew A.L. lived in the house. And throughout the probate process, Crandall encouraged A.L. to sell the house. The panel noted: "By selling the house, the respondent's attorney fees could be satisfied."

In September 2012, the probate court dismissed the probate case for lack of activity. The hearing panel found: "At no time during the seven and one-half years that the respondent represented Anthony L. and A.L. as executors of M.L.'s estate, did the respondent seek an extension of time, under K.S.A. 59-1501." Under that statute, an estate must be settled within nine months of the appointment of an executor or administrator unless the district court grants an extension.

Shortly after the dismissal, Crandall filed a petition requesting the dismissal be set aside. The district court granted the motion. Subsequently, Crandall took little action for an additional extended period of time.

Sometime after the court reopened the case, A.L. spoke to someone other than Crandall and learned he might be eligible for a homestead exemption related to the sole estate asset—the home where A.L. continued to live. A.L. testified he did not inform Crandall because Crandall had not seemed concerned about the effect of the house's sale on A.L. personally. Crandall had never suggested to A.L. he might have a homestead right.

In January 2015, the district court held a hearing on M.L.'s estate. A.L. raised the possibility he had homestead rights. Crandall sought permission to withdraw as A.L.'s counsel. The district court granted Crandall's request a few days later.

In February 2015—seven years and five months after Crandall had filed the petition to probate M.L.'s will—Crandall petitioned for fees and expenses in the matter, requesting fees and expenses of $16,388.32. The most recent appraisal of the real property—the only asset of the estate—valued it at $35,000. Leonard Hall, who replaced Crandall as A.L.'s counsel, filed a written defense to Crandall's request for fees and expenses. In that response, Hall noted, among other things, that the value of the property declined by more than one-half during Crandall's representation.

Hall also filed a petition for determination of homestead and final settlement. Crandall wrote a defense and opposed the petition for determination of homestead. The district court, with a new judge presiding because the previous judge had retired, granted A.L.'s petition for determination of homestead. The district judge questioned Crandall's standing to oppose the petition but determined the question was moot. The judge granted in part Crandall's petition for fees. Based on a review of the eight-factor test established in KRPC 1.5(a), the judge determined the just and reasonable legal fees and expenses totaled $3,293.56 rather than the $16,388.32 Crandall had requested. The district judge then forwarded a copy of his order to the Disciplinary Administrator, who docketed it as a complaint.

Against this factual background, we turn to our standard of review.

ANALYSIS

In a disciplinary proceeding, we consider the evidence, the hearing panel's findings of fact and conclusions of law, and the parties' arguments to determine whether KRPC violations exist and, if so, what discipline to impose. *In re Lundgren*, 306 Kan. 482, 500, 394 P.3d 842 (2017). Misconduct must be established by clear and convincing evidence, which is "'evidence that causes the factfinder to believe that "the truth of the

14

facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]); see also Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 251).

When testimony conflicts, we recognize the hearing panel had an opportunity to observe witnesses and evaluate demeanor. We do not reweigh evidence or pass on credibility. Rather, we examine any disputed findings to determine whether clear and convincing evidence supports the findings of the panel as trier of fact. *In re Hawver*, 300 Kan. 1023, 1038, 339 P.3d 573 (2014); *In re Walsh*, 286 Kan. 235, 246, 182 P.3d 1218 (2008).

Although clear and convincing evidence is required to prove misconduct, the standard is different in considering the aggravating and mitigating factors the hearing panel weighs: "[S]ome evidence of [aggravating and mitigating] circumstances must be presented for weighing." *In re Biscanin*, 305 Kan. 1212, 1220, 390 P.3d 886 (2017). The panel determines "how much weight to assign to each [aggravating or mitigating circumstance] in arriving at an appropriate discipline." *Walsh,* 286 Kan. at 248. The hearing panel's and the Disciplinary Administrator's recommendations on discipline are "advisory only and do not prevent [this court] from imposing greater or lesser sanctions." *Biscanin*, 305 Kan. at 1229; see also Supreme Court Rule 212(f) (2018 Kan. S. Ct. R 255).

With these standards in mind, we next turn to the parties' arguments and our review of the hearing panel's findings and conclusions. We first consider some threshold legal arguments. Then we will turn to Crandall's arguments that are specific to findings or conclusions of the hearing panel.

1. *This court has subject matter jurisdiction in DA11921.*

Crandall argues we lack subject matter jurisdiction over the alleged disciplinary violation in DA11921 because it involved his activities as a Missouri-licensed attorney advising Missouri clients.

Crandall did not challenge subject matter jurisdiction before the hearing panel. But subject matter jurisdiction may be raised at any time. *Dennis*, 286 Kan. at 723-24. We thus consider Crandall's subject matter jurisdiction challenge despite it being raised for the first time before us.

In making that challenge, Crandall does not raise a choice of law issue by arguing that Missouri law or Missouri rules of attorney discipline differ from the Kansas rules applied by the disciplinary panel. Instead, focusing on subject matter jurisdiction, Crandall draws an analogy to criminal law under which a criminal defendant may only be prosecuted in the jurisdiction where the crime occurs. Because his clients were Missouri residents, he argues this means we cannot discipline him. Crandall's analogy breaks down because the record reflects (1) Crandall operates under a Kansas-licensed LLC, (2) Crandall appears to have had only one office when V.A. and B.A. executed the agreements, and that office was in Kansas, and (3) the relevant agreements were notarized in Kansas. Thus, at least the execution of the estate planning documents occurred in Kansas. While Missouri law may have governed the documents, acts giving rise to the allegations of misconduct occurred in Kansas.

Moreover, while Crandall correctly recites the criminal rule, he fails to recognize that the rule is rooted in the Kansas Constitution. See Kan. Const. Bill of Rights, § 10. No

16

similar constitutional provision exists for attorney discipline matters. But the Kansas Constitution, Article 3, § 1 vests the Kansas Supreme Court with the authority to administer the judicial department of Kansas government and to exercise judicial power. This power includes "maintaining high standards for the practice of the law." *Martin v. Davis*, 187 Kan. 473, Syl. ¶ 5, 357 P.2d 782 (1960). This authority "extends beyond the initial licensing of attorneys," and admitted attorneys "are amenable to the rules and discipline of the court in all matters of order and procedure and to the continuing supervision and control of the practice of law not in conflict with the federal and state constitutions." 187 Kan. 473, Syl. ¶ 5.

One of our rules, Supreme Court Rule 201 (2018 Kan. S. Ct. R. 233), subjects "[a]ny attorney admitted to practice law in this state . . . to the jurisdiction of the Supreme Court and the authority hereinafter established by these Rules." The rule does not specify whether jurisdiction means personal jurisdiction, subject matter jurisdiction, or both. But KRPC 8.5 (2018 Kan. S. Ct. R. 382) (jurisdiction) clarifies that a Kansas attorney "is subject to the disciplinary authority of this jurisdiction although engaged in practice elsewhere." These rules, when read in conjunction, make clear we have subject matter jurisdiction to exercise disciplinary authority over Kansas licensed attorneys even when engaged in practice outside Kansas. The Disciplinary Administrator points us to two cases as additional support for this reading of Rule 201: *Walsh*, 286 Kan. 235, and *In re Eastepp*, 258 Kan. 766, 907 P.2d 842 (1995).

In *Walsh*, the respondent, like Crandall, argued the alleged misconduct occurred in Missouri and thus Kansas had no jurisdiction. We rejected his argument, citing Rule 201 and previous decisions holding that "Kansas attorneys can be disciplined for conduct committed outside of Kansas." 286 Kan. at 250-51. The *Walsh* court referred to two such decisions. In one, *In re Arnold,* 274 Kan. 761, 762, 56 P.3d 259 (2002), the claimed rule violation had occurred in federal court. Although that made the case somewhat

17

distinguishable, "there is still nothing limiting the jurisdiction of this court over the actions of an attorney admitted to practice law in Kansas merely because those actions occur in another state." 286 Kan. at 251. The *Walsh* court also relied on *Eastepp*, 258 Kan. at 766-69—the second case cited by the Disciplinary Administrator in response to Crandall's argument. In *Eastepp,* we imposed reciprocal discipline on a Kansas attorney for misconduct engaged in in Colorado. *Walsh, Arnold*, and *Eastepp* support the conclusion that this court had authority to discipline Kansas-licensed attorneys no matter where the misconduct occurred. *Walsh*, 286 Kan. at 250-51.

Comments to KRPC 8.5 and commentators reinforce that it is appropriate for a licensing jurisdiction to impose discipline on a lawyer licensed in that jurisdiction even when the conduct occurs outside its territorial boundaries. For example, the comments to the ABA's Model Rule of Professional Conduct 8.5 explain: "It is longstanding law that the conduct of a lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction." Bennett, Cohen & Gunnarsson, ABA Annotated Model Rules of Professional Conduct, Rule 8.5, p. 707 (8th ed. 2015). As other commentators explain, misconduct in another jurisdiction "still reflects on the ability of that lawyer to practice" in the licensing jurisdiction. Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility § 8.5-1, at 1433 (2017).

A Kansas attorney's license "is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters." Supreme Court Rule 202 (2018 Kan. S. Ct. R. 233). An attorney's misconduct raises the question of whether and under what circumstances that proclamation should continue. For this reason, and all the reasons discussed above, we conclude we have subject matter jurisdiction to review Crandall's alleged misconduct and can exercise that jurisdiction to impose discipline even for claims involving non-Kansas residents.

18

## 2. *Crandall failed to preserve his constitutional arguments.*

In Crandall's brief, he also argues we lack authority to impose discipline because KRPC 8.5 and Rule 201 infringe on his rights to free speech and free association under the First and Fourteenth Amendments to the United States Constitution. In addition, during oral argument to this court, Crandall raised a due process argument by alleging the rules did not give him notice that his actions would constitute misconduct. Crandall did not raise any of these issues during the proceedings before the hearing panel.

Focusing first on the argument Crandall raised at oral argument, we consider this argument to have been waived by Crandall's failure to provide us with a written argument—along with supporting authority. See Supreme Court Rule 212(c) (considering admitted any portion of final hearing report not excepted to); Supreme Court Rule 212(d) (requiring exceptions to hearing report be filed within 20 days; limiting respondent's presentation to "statement with respect to the discipline to be imposed" when a respondent fails to file exceptions); Supreme Court Rule 212(e)(5) (disciplinary matters are set for arguments as in appeals and presentation is limited to exceptions made to panel report and commenting on discipline to be imposed); see also *In re Johnson*, 262 Kan. 275, 279, 936 P.2d 258 (1997) (noting arguments in disciplinary proceedings "should be presented at the hearing before the panel and not for the first time at oral argument before this court").

Crandall did present written arguments on the First and Fourteenth Amendments, however. He argued his interactions with B.A. and V.A. were "protected by Respondent's rights to free speech and freedom of association protected by First and Fourteenth Amendments to the United States Constitution." And because "[t]he Rules of Professional Conduct do not purport to govern the speech or conduct of everyone, but

19

merely attorneys" and the court must examine "the content of Respondent's speech and the nature of Respondent's association with B.A. and V.A.," he argued we must apply strict scrutiny to review "the state's proposed restriction on Respondent's speech and freedom of association."

In response, the Disciplinary Administrator presents a multi pronged argument attacking both the merits and the procedural viability of Crandall's position. As for the procedural soundness, the Disciplinary Administrator argues we should not consider Crandall's constitutional objections because Crandall did not argue them before the hearing panel. This failure, the Disciplinary Administrator asserts, amounts to an abandonment of the issue. The Disciplinary Administrator also noted that Crandall failed to establish the applicability of any exception to the general abandonment rule. For authority, the Disciplinary Administrator cites Kansas Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34) and *State v. Godfrey*, 301 Kan. 1041, Syl., 350 P.3d 1068 (2015).

Rule 6.02 sets out the requirements for filing an appellant's brief. In subparagraph (a)(5), it requires that "[i]f the issue was not raised below, there must be an explanation why the issue is properly before the court." Although this rule applies to an "appellant," it is incorporated into disciplinary proceedings in this court through Kansas Supreme Court Rule 212 if a respondent has filed exceptions.

Rule 212(e)(3) (2018 Kan. S. Ct. R. 257) requires a disciplinary respondent to file a brief, sets forth the timeframe for doing so, and states: "The briefs shall be of such number *and form* and be served in such manner as is provided by the rules relating to appeals in civil actions." (Emphasis added.) Rule 6.02 specifies the form for Crandall's brief, and it required him to explain why the constitutional issue was properly before the court even though he had not raised it before the hearing panel. See Rule 6.02(a)(5);

20

*Godfrey*, 301 Kan. 1041, Syl. ("Kansas Supreme Court Rule 6.02[a][5] . . . requires an appellant raising a constitutional issue for the first time on appeal to affirmatively invoke and argue an exception to the general rule that such claims may not be raised for the first time on appeal. Failure to satisfy Rule 6.02[a][5] in this respect amounts to an abandonment of the constitutional claim."); *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010) (discussing exceptions that an appellant may invoke to justify raising a constitutional issue for the first time on appeal).

Our caselaw makes clear that respondents in disciplinary cases must comply with Rule 6.02. We could cite a long line of cases in which this court has enforced Rule 6.02 when disciplinary respondents have filed briefs that do not comply with its requirements but note only a few to illustrate. See, e.g., *Hawver*, 300 Kan. at 1048 ("document attached to Hawver's brief is not properly before this court because it is not part of the record" as required by Rule 6.02[b]"); *Dennis*, 286 Kan. at 723 (faulting respondent's brief because it contained neither a statement of facts nor specific citations to the record on appeal as required by Rule 6.02[d] [2007 Kan. Ct. R. Annot. 37]).

We deem Crandall's constitutional issues abandoned because of his failure to raise the arguments to the panel and his failure to comply with Rule 6.02(a)(5)'s requirement that he explain why we should consider his constitutional arguments when they are raised for the first time in his brief in this court. As a result, we do not reach the parties' arguments about the merits of Crandall's constitutional issues.

3. *Crandall failed to preserve the issue of whether the panel should have admitted the investigators' reports.*

Next, Crandall objects to the hearing panel's refusal to admit the reports of the attorneys who investigated the two complaints and then drafted reports for the Disciplinary Administrator. A different attorney prepared the report related to each case.

21

Each report detailed an attorney's investigation and conclusions about whether any rule violations occurred. Both reports were largely favorable to Crandall. The investigator on DA11921 found no rule violation. The investigator on DA12304 found only one violation—a violation of KRPC 1.5(a) for billing secretarial services at an attorney's rate.

Crandall asked to submit both reports as exhibits in his case but did not plan to call the authoring attorneys. The Disciplinary Administrator objected, arguing the reports contained hearsay, opinions, conclusions, and constituted the Administrator's work product. Crandall's attorney offered the reports "as a guide to help this Panel." He also stated "there is nothing in those reports which will not be backed up by other evidence that we will, in fact, introduce in this case." Crandall's attorney agreed with the Chairman's description that the reports offered "opinions as to whether or not there have been rules violations in each case." The hearing panel excluded the reports, concluding the reports were hearsay and offered opinions on the ultimate questions to be decided by the panel.

Before turning to the parties' arguments, we note that disciplinary hearings before a panel are "governed by the Rules of Evidence as set forth in the Code of Civil Procedure." Supreme Court Rule 211(d) (2018 Kan. S. Ct. R 252). We therefore consider these arguments in light of the Rules of Evidence. The Disciplinary Administrator invokes one of those rules—K.S.A. 60-405—to argue Crandall is procedurally barred from raising the issue because he did not ask the hearing panel to admit the reports under a hearsay exception.

As the Disciplinary Administrator argues, this court has interpreted K.S.A. 60-405 to mean "the party arguing for admission of evidence must provide the trial judge with a specific basis for admission so the judge has a chance to fully consider whether the evidence should be admitted and to avoid any potential reversible error." See *State v.*

*Tague*, 296 Kan. 993, 998, 298 P.3d 273 (2013). The same rationale applies equally when a hearing panel conducts the factfinding proceeding as it does when a judge conducts the proceeding. And *Tague* presents analogous circumstances and arguments to those presented by Crandall.

Misty Tague asked this court to consider whether an exception existed for admission of hearsay and argued exclusion of the evidence violated her constitutional right to a fair trial. But she had not made those arguments at trial, and, as we noted, the "right [to present a defense] is not unlimited, but is instead subject to statutory rules and caselaw interpretation of the rules of evidence and procedure." 296 Kan. at 1000. And Tague failed to comply with statutory rules and the judicial interpretation of those rules that established the trial court must be alerted to any possible hearsay exception before making the decision about whether to admit hearsay evidence. Plus, even without the disputed evidence, Tague presented evidence supporting her defense theory. Thus, we declined to reach the merits. 296 Kan. at 1000-01.

Similarly, here, when the Disciplinary Administrator objected based on hearsay, Crandall's attorney argued no hearsay exception or exclusion as a basis for overcoming the hearsay objection and admitting the reports. If Crandall had done so, the panel would have had the opportunity to consider the argument and correct any potential error. And because Crandall failed to present the hearing panel with an opportunity to rule on any hearsay exception, we conclude, as we did in *Tague*, that Crandall failed to preserve the issue for review. The failure to preserve the issue means that, under K.S.A 60-405, the hearing panel's "finding[s] shall not be set aside."

Crandall, like *Tague*, also argues not admitting the reports violated his right to procedural due process. We have held that the Due Process Clause of the United States Constitution applies to lawyer discipline proceedings. *In re Harrington*, 305 Kan. 643,

23

657, 385 P.3d 905 (2016). But the constitutional right to present a theory of defense is still "subject to certain restraints: the evidence must be relevant, and evidentiary rules governing admission and exclusion of evidence are applied." *State v. Robinson*, 306 Kan. 431, 436, 394 P.3d 868 (2017). This includes the rules of evidence governing admissibility of expert testimony. See *State v. Cooperwood*, 282 Kan. 572, 575-78, 147 P.3d 125 (2006). Crandall had opportunities to present a hearsay argument, but he did not. Thus, as in *Tague*, the constitutional argument does not overcome the preservation obstacle. And Crandall still presented his theory of defense through his own testimony, his expert's testimony and report, and through his cross-examination of the Disciplinary Administrator's witnesses.

Moreover, while Crandall presents extensive arguments about the hearing panel's hearsay ruling, he did not address in his brief the panel's alternative justification for its ruling: The reports are improper opinion testimony. Even after the Disciplinary Administrator noted the alternative basis for the ruling and Crandall's failure to discuss it, Crandall did not file a reply brief. Without argument on this point, Crandall has abandoned any argument that the hearing panel's ruling was erroneous. See *In re Hodge*, 307 Kan. 170, 216, 407 P.3d 613 (2017).

We do not reach the merits of Crandall's arguments about the failure to admit the investigators' reports because he failed to preserve or properly present those arguments.

Before leaving this issue, we consider Crandall's attacks on the Disciplinary Administrator. Crandall argues we should consider the reports because he understood there to be an agreement with the Disciplinary Administrator to admit them. The Disciplinary Administrator denies this allegation, pointing out Crandall or his attorney would have raised any agreement at the hearing if an agreement had been in place.

We find ourselves unable to resolve this dispute, however, because Crandall did not raise it before the hearing panel that could have made the necessary findings of fact. His failure to raise his objection below is now fatal to his claim. K.S.A. 60-405.

4. *Clear and convincing evidence supports the hearing panel's findings about the unreasonableness of attorney fees in DA11921, and we conclude Crandall violated KRPC 1.5.*

Crandall next objects to the hearing panel's conclusion that he violated KRPC 1.5 by charging B.A. and V.A. an unreasonable fee. KRPC 1.5(a) (2018 Kan. S. Ct. R. 294) identifies eight factors to consider in determining whether a fee is reasonable:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent."

We will examine the record and the hearing panel's findings relating to each factor.

4.1 *Time and labor required, novelty and difficulty, and skill required*

The hearing panel concluded the representation in DA11921 was straightforward, only complicated by disagreement among B.A. and V.A.'s children. Crandall makes a

25

two-pronged response. First, he argues his time and labor justify the fee. Second, he argues he performed difficult and novel work.

As to the first point, Crandall asserts the time he spent was significant. He relies on several parts of the record to support this point: the log of services he provided the panel, his expert's testimony, and the testimony of Janssen.

As for the log, as one hearing panel member suggested in a separate decision, Crandall's reported hours "were not composed contemporaneously with the work done." And the detail of the time recorded on the log weakens the persuasiveness of Crandall's argument. For example, our review of the log reveals that Crandall reported hours for which he worked on matters related to veterans benefits—these may include hours for which he could not legally charge. Thus, there is good reason to question Crandall's records.

Next, Crandall points to his expert's testimony and report. Kerr testified he does not do many fixed-fee arrangements like the one at issue here that offers services for three years. Kerr limits his practice to having no more than 18 of these arrangements at any given time because it "takes an awful lot of time to service these agreements and, of course, you don't know what you're getting into at the front." Kerr also testified the fee is based on both the anticipated amount of work over a three-year contract and the ages of the people and their assets.

The panel seemed to give little weight to the fact that Crandall agreed to provide services to B.A. and V.A. for three years. There are several reasons for this. First, Crandall's testimony is inconsistent with Kerr's reliance on the amount of work required when justifying the fee. Crandall testified he charged consistently with what the National Network of Estate Planning Attorneys teaches, which is "roughly based on the value

provided to the client." Thus, Crandall did not stress the work he might perform in the future, making it understandable the panel likewise placed little emphasis on the point. And both Janssen and Ridenour testified that they and other attorneys in the community routinely include as part of their fee many of the same services, including meeting with fiduciaries and answering their questions, not charging for calls they could easily answer, and sending out client letters when relevant laws change. Finally, the fee agreement anticipated additional charges for the types of things likely to require significant time on Crandall's part, such as changes to the estate plan.

Crandall next points to Janssen's testimony, which he characterizes as suggesting "the expected labor in this particular case was so significant that she would have declined the representation." Crandall, as the Disciplinary Administrator asserts, mischaracterizes Janssen's testimony. Janssen did testify she would not have taken the case because of the family conflict. She explained the need to have the entire family on board, which was not the case here. Without that buy in, she would have declined the representation—not because of the hours required—but because, "You are ripe for all kinds of complaints that have actually happened in this matter." She does agree that an unhappy family may require more time than a happy family. But, cognizant of the family conflict, she concluded the fee Crandall charged was unwarranted by the work needed.

Closely tied to this opinion was Janssen's opinion that the estate planning involved here was straightforward and not novel. She testified, "Well, of course I want to say my area of practice is particularly novel and difficult and not everyone can do it. That being said, . . . absent the family dynamic issues, this is a fairly straightforward case." The panel adopted this view as its finding.

Crandall criticizes the hearing panel's conclusion. He first cites Kerr's report, highlighting statements that (1) the planning allowed his client to qualify for veterans

benefits and (2) there were a limited number of elder law attorneys in Kansas (42 statewide, 13 in Overland Park, none in Kansas City). He next criticizes the testimony of Ridenour, asserting Ridenour cannot be an expert because he does not handle veterans benefits at all and does not provide Medicaid planning without getting outside help. Even accepting these arguments, the hearing panel still had Janssen's testimony, which it apparently found persuasive.

Crandall does cite a sentence in Janssen's testimony that he reads to support his position that the planning he did was complicated. But once again, Janssen's testimony was not entirely consistent with Crandall's representation. What she said was, "So the issue almost always is that we have too many assets. So the rule of thumb of assets for Veterans Administration eligibility is 80,000. The Medicaid stuff is more complicated, so we won't talk about really that today because we only have so much time." While Janssen used the word complicated, she did so in the context of stating only that the Medicaid rules were more complicated than the rules of the Veterans Administration. And ultimately, as we have already noted, she stated that "absent the family dynamic issues, this is a fairly straightforward case."

In summary, Janssen's testimony provides clear and convincing evidence and establishes that the representation of B.A. and V.A. was straightforward and did not require the time and labor needed to justify the amount Crandall charged.

4.2    *Preclude other employment*

The panel concluded the representation in DA11921 did not preclude other employment because "the estate was a fairly typical case." Janssen's testimony again provides clear and convincing evidence that supports the finding that the estate was a

fairly typical case. It is less clear that that finding supports concluding the engagement did not preclude other employment.

Crandall's Services Addendum informed the client, "If we are working on your matters, that precludes us from working on matters for others." Perhaps this put the clients on notice that Crandall would not work on other matters to be available to these clients. Kerr, as we have noted, also testified he limits the number of these types of engagements because of the time commitment they can entail and the unknown nature of that commitment. The hearing panel's final report does not address the quoted language in the Services Addendum, Kerr's testimony, or any impact these may have on the determination of whether this engagement precluded other employment.

The Disciplinary Administrator counters that "[i]f the mere fact an attorney can work on only one case at a time satisfied this factor, then it would apply in every case." This exaggerates Crandall's position. Crandall is not arguing this factor should apply in every case—he is arguing that because the agreement here is similar to a retainer that assures he will remain available to this client for three years, then the client should bear the expense of securing that availability.

In sum, although the estate planning portion of this case does not appear to support concluding that this representation precludes other employment, the continuing three years of additional services may.

### 4.3    *Fee customarily charged*

The hearing panel determined the fee customarily charged in the locality is between $3,000 and $8,000. This determination is supported by clear and convincing evidence, again through the testimony of Janssen and, to a lesser degree, Ridenour.

Crandall seeks to distinguish the services covered by his contract from those provided by other practitioners, particularly citing his probate avoidance guarantee and continuing services under the contract. Crandall also tries to discredit the Disciplinary Administrator's experts, particularly Ridenour, and asks us to consider one of the investigators' reports even though the hearing panel excluded it from evidence.

The Disciplinary Administrator points to reasons the hearing panel chose not to credit Crandall's arguments. For example, the no-probate guarantee requires paying an additional annual maintenance fee of $1,500 after the first three years, plus a death administration fee to be paid by the heirs. And Janssen and Ridenour both testified to the types of services they include as part of their fee, including meeting with fiduciaries and answering their questions, not charging for calls that can be easily answered, and sending out client letters when relevant laws change. The Disciplinary Administrator also argues that Crandall's fee is unreasonable because it is three times higher than the highest going rate based on a formula that had nothing to do with the family conflict he blames for much of the time he recorded.

Although Crandall has a point that his fee includes services over three years, the hearing panel appears to have been unpersuaded that the services Crandall provides are substantially different from the continuing services other attorneys also provide as part of their initial fees. That conclusion is factually supported by Janssen's and Ridenour's testimony and Crandall's engagement agreements about the limitations on what is included in his continuing services. This testimony and these documents constitute clear and convincing evidence supporting the panel's conclusion.

4.4     *The amount involved and the results obtained*

Crandall prepared an integrated estate plan for the purposes of immediately qualifying V.A. and B.A. for veterans benefits, qualifying them for Medicaid benefits sometime in the future, and administering their assets by trust. For this work, Crandall charged $31,026—$27,586 for long-term care planning services and $3,440 for deliberate legacy services.

In justifying the amount of the fee, Crandall and Kerr put weight on the benefits B.A. and V.A. received because of the veterans trust. The panel did not discuss or seemingly weigh these benefits. Crandall, in his brief, asserts "the clients have received over $60,000 in Veterans Administration benefits to date." While B.A. and V.A. did benefit from receiving veterans benefits, we cannot locate the $60,000 figure in our record. And as of the date of the panel hearing, V.A. and B.A. had not received Medicaid benefits.

At one point in Crandall's testimony, he computed the value of his services by considering "what a nursing home cost would be per month . . . and kind of look at what the value of the assets are involved." Using this method, Crandall calculated a value of $25,855. He then later explained this number was "a multiple of five nursing home expenses, which were estimated at that time in the area, which was I think $5,171 . . . per month at that time." That number is slightly less than the $27,586 Crandall charged V.A. and B.A. for long-term care planning services—a number he never fully explained. But perhaps coincidentally, the amount corresponds to what V.A. and B.A. actually paid Crandall. He did say that the $27,586 actually billed represents "what you're returning to them by doing the planning. It's a value-based determination of fee." He also testified that he considered "something less than 5 or 6 percent of the value of the assets and a multiple of approximately the value of months of being in the nursing home" as a reasonable fee.

The fee Crandall charged was more than six percent of the value of the estate and more than his calculation of five months of nursing home expenses. We do not find an explanation in the record that correlates to the fee actually charged. This lack of explanation along with the varying statements made by Kerr and Crandall about what the fee represents decreases the persuasiveness of Crandall's argument that the fee can be justified based on the results achieved.

The Disciplinary Administrator also points out that Crandall conceded another attorney could have obtained the same benefit. But Crandall charged three times the going rate in the community. The panel emphasized this point.

Crandall counters by arguing he spends time with his clients determining their goals and their needs and does not adopt a cookie cutter approach to trust preparation. But he stated he used forms provided by the National Network of Estate Planning Attorneys, and the Disciplinary Administrator's experts pointed to unnecessary provisions that did not apply to V.A.'s and B.A.'s circumstances. The experts described the plan as needlessly complex and "complete overkill." He also argues he offers future services. But the value of these services is questionable. His "no probate" guarantee contains four very specific requirements that must be met for the guarantee to be effective. Significantly, these requirements include the payment of additional fees. As to the three-year follow up period, Crandall placed limitations on what was free. The services he does provide without charge include many of the usual and customary services most attorneys in the area offer for free after execution of similar estate plans.

Thus, Crandall's estate planning did confer some benefit to V.A. and B.A. But clear and convincing evidence supports the panel's conclusion that the fee amount is not supported by the results obtained.

4.5     *The time limitations imposed by the client or circumstance*

Clear and convincing evidence supports the hearing panel's conclusion that neither B.A., V.A., nor their children imposed any time limitations on the respondent. Crandall presents no argument to the contrary.

4.6     *Nature and length of relationship with client*

No party disputes the hearing panel's conclusion the attorney-client relationship between B.A. and V.A. and Crandall began in 2007.

4.7     *Crandall's experience, reputation, and ability*

In considering the seventh factor, the hearing panel stated: "No evidence was presented as to the respondent's experience, reputation, and ability, other than the respondent's own testimony about how long he has been practicing law in this area." Crandall criticizes the hearing panel's conclusion that the only evidence of his experience, reputation, and ability was his own testimony. Although critical of this conclusion, Crandall largely cites his own testimony to dispute it. He also cites to Kerr, who opined that Crandall's ability is high. But Kerr acknowledged he does not know Crandall's reputation in Kansas. The record does not contain evidence suggesting Crandall's experience, reputation, or ability warranted a fee so much higher than the typical fee charged by other practitioners.

4.8     *Fixed or contingent fee*

The hearing panel noted the fee was fixed. Neither party disputes or otherwise challenges this conclusion.

4.9     *Conclusion:  The factors weigh in favor of a determination that the fee was unreasonable.*

Overall, clear and convincing evidence supports most of the hearing panel's findings. And even where there is some question—the weight given to the three-year commitment and the failure to recognize the benefits received—those factors do not weigh in favor of a determination that Crandall's work, his skill, the results he achieved, or any other consideration can justify charging the fee Crandall charged V.A. and B.A.

In addition, Crandall at oral argument tacitly conceded he asked no other Kansas lawyer about the propriety of such a fee structure. He stated he instead consulted other members of the National Network of Estate Planning Attorneys about the flat fee structure that organization advocates. Had Crandall done his due diligence, either by consulting other Kansas lawyers or researching our caselaw, he should have discovered cases revealing his proposed structure, which included a nonrefundable fee, could potentially violate KRPC 1.5. We previously adopted other panels' conclusions of law that "[n]onrefundable flat fees are *per se* unreasonable." *In re Knox*, 305 Kan. 628, 634, 641, 385 P.3d 500 (2016) (quoting *In re Scimeca*, 265 Kan. 742, 962 P.2d 1080 [1998]); see also *In re Dellett*, 299 Kan. 69, 78-79, 85, 324 P.3d 1033 (2014). We also adopted a hearing panel conclusion that a provision in an engagement contract specifying that the attorney earns the fee in full when paid "is tantamount to charging a nonrefundable fee." *Dellett*, 299 Kan. at 79, 85.

While Crandall's agreement stated the fee was nonrefundable because the work had been performed, he now argues the fee included the risk of a three-year period of work yet to be performed. Granted, Crandall argues the fee was in part a retainer for those future services. But his testimony on this point was confusing, if not contradictory. And the same is true of the written fee agreement. For example, the agreement is internally inconsistent because it at times refers to a flat fee and at other times uses the term "retainer." The agreement also states that Crandall earned the fee at the time B.A. and V.A. made the payment, even though Crandall would perform some services over a three-year period. The distinction makes an important difference in determining how an attorney handles the fee. See Annotated Model Rules of Professional Conduct, Rule 1.5, pp. 89-90 (noting that a retainer is earned in full when paid, but an advance or flat fee may require the funds be deposited into a trust account until earned).

Moreover, Crandall presented no evidence establishing that the amount was a reasonable fee for a three-year retainer. He provided no information about how much follow up typically happens during the three-year period. Fee structures based on something other than billable hours can be reasonable. But we determine this fee is unreasonable when we take into account:  (1) the lack of evidence explaining or justifying the fee calculation, (2) the conflicting explanations for the fee, (3) the lack of clarity in the agreement as to how the fee was determined, and (4) the evidence of what other attorneys in the community charge for the same service (and result), including answering follow-up questions and providing follow-up advice and information.

In conclusion, clear and convincing evidence supports the hearing panel's conclusion that Crandall violated KRPC 1.5.

We now turn to the complaint against Crandall in DA12304. As a preliminary matter we discuss Crandall's argument that we should not give any weight to the district court's second homestead ruling.

5. *Crandall's arguments about the district court's homestead ruling do not offset the rule violations in DA12304.*

Crandall argues A.L. had no homestead right under the Kansas Constitution. The Disciplinary Administrator points out a district court judge decided this issue and then argues it is not subject to collateral attack. Crandall, however, argues no deference is required.

We need not engage in an extensive discussion of those arguments because, at a minimum, the district court's ruling on A.L.'s motion to establish a homestead right highlights that different attorneys and a judge viewed the effect of some facts in a manner contrary to Crandall's opinion. The judge's ruling also suggests Crandall needed to revisit the evaluation of A.L.'s homestead right as the estate case progressed. At first, as Crandall argues, competing and disputed deeds controlled the disposition of the home. But Crandall negotiated with the Kansas Estate Recovery Program to invalidate both deeds. The district court set aside these deeds, which effectively brought the house into the estate. A.L. continued to live in the house, as he had for years, and he paid off the mortgage. Given those facts, an attorney informed A.L. that he might have a homestead right in the property. Yet another attorney, who replaced Crandall as A.L.'s counsel, apparently felt he could assert a good faith claim to a homestead right. And the attorney for the Kansas Estate Recovery Program testified before the hearing panel that he thought it sounded like A.L. established a homestead claim. He felt the Kansas Estate Recovery

Program would have an uphill battle to defeat the claim. Finally, a district court judge determined a homestead right did exist.

These circumstances suggest the facts of the case as applied to the law must not have made the outcome as black and white as Crandall asserts. But Crandall appears to have been blind to the opposing view. In short, while an appeal of the homestead ruling might have established Crandall correctly interpreted the law, we approach the issue recognizing there was room among those learned in Kansas law and with knowledge of the facts of the case to disagree about whether A.L. had a valid homestead claim. Moreover, whether the judge was correct is not dispositive of this issue. Instead, we face the reality of what happened, and we view the panel's findings and conclusions of law through the lens that reasonable people disagreed with Crandall.

6. *Crandall violated KRPC 1.4(b), KRPC 1.7, and KRPC 8.4(d) by taking actions contrary to A.L.'s homestead right.*

Crandall makes a blanket argument about the alleged violations of KRPC 1.4 (b), KRPC 1.7(a), and KRPC 8.4(d) based on his position that A.L.'s homestead claim lacked any vailidity. Crandall argues the panel's conclusion "only ha[s] merit if A.L. actually had a homestead right" to assert, which A.L. did not based on three cases Crandall cited. Alternatively, he encourages us to find no violation even if he was mistaken in his interpretation of Kansas law. He argues he has a duty to refrain from asserting a frivolous claim under KRPC 3.1 (2018 Kan. S. Ct. R. 343) (meritorious claims and contentions). He claims he has no duty to inform a client of a potentially frivolous claim, citing KRPC 2.1 (2018 Kan. S. Ct. R. 339) (exercise of independent professional judgment). He also asserts his duty of candor, KRPC 3.3(a)(2) (2018 Kan. S. Ct. R. 344) (candor to tribunal), required him to disclose the contrary authority he relied on before the second district judge. Finally, he argues he was entitled to rely on the probate court's earlier order that there was no homestead right as law of the case. We consider each rule in turn.

37

## 6.1    *Crandall violated KRPC 1.4.*

The hearing panel found Crandall violated KRPC 1.4(b) (2018 Kan. S. Ct. R. 293) about a lawyer's obligation to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions." Crandall violated KRPC 1.4(b) "when he (1) failed to advise A.L. of a hearing, (2) failed to advise A.L. as executor of the estate that A.L. may have a homestead claim and (3) failed to advise A.L. that [he had] agreed to an order which waived A.L.'s homestead exemption."

The Disciplinary Administrator concedes the panel made no specific finding of fact that Crandall failed to advise A.L. of the hearing. In fact, the evidence showed Crandall told A.L. about the hearing but stated that A.L. needed not appear. As a result, we disregard the panel's conclusion about an alleged failure to advise A.L. of a hearing.

The panel next faulted Crandall for failing to advise A.L. as executor of the estate that he may personally have a homestead claim against the estate. Crandall asserts he had no duty to inform A.L. of a potential homestead claim because any homestead claim belonged to A.L. personally, not in his capacity as the estate's personal representative. Because Crandall did not represent A.L. personally, he argues, he had no duty to inform A.L. in his capacity as personal representative. Crandall cites no law to support his argument.

Crandall did limit the scope of his representation. The Disciplinary Administrator concedes the point but argues Crandall still violated KRPC 1.4 by failing to advise his client, as executor, of a potential homestead claim that could be raised against the sole asset of the estate and of the impact the claim might have on other aspects of handling the estate. This nondisclosure, according to the Disciplinary Administrator, violated KRPC

38

1.4 because it deprived A.L. of sufficient information he could use when engaging in settlement discussions. See KRPC 1.4, comment 1. The Administrator also cites an Oregon State Bar ethics opinion, Or. Ethics Op. No. 2005-62, for the proposition that Crandall's duty included advising "the personal representative about any conflicts of interest or other problems that the personal representative may face in the discharge of his or her duties."

We agree with the Disciplinary Administrator's position and the Oregon opinion. Crandall certainly did not have to walk A.L. through his homestead claim because that was personal to A.L. and thus outside the scope of the agreed upon representation. But he should have raised the possibility as a potential conflict that A.L. needed to consider in his role of administering M.L.'s estate. But Crandall admits he never discussed the potential for a homestead claim with Anthony or A.L.

Crandall also reasserts his position that A.L. had only a frivolous homestead claim. Crandall argues the first district judge specifically found no homestead exemption when he signed the order voiding the two separate deeds. But Sherber, the other attorney involved in that proceeding on behalf of the Kansas Estate Recovery Program, testified differently, indicating he added the language about the homestead exception based on similar orders he had drafted in the past. Sherber also stated the attorneys did not discuss any potential homestead claim with the judge before the judge signed the order voiding the deeds. The hearing panel found Sherber's testimony on this issue more credible. Beyond the credibility determination, it is again worth noting that at least one district judge and two or more Kansas lawyers disagreed with Crandall's assessment that A.L.'s homestead claim was frivolous.

The third aspect of the rule violation, as found by the panel, related to Crandall agreeing to an order that stated the house was not a homestead. Crandall asserts his

actions were protected under KRPC 2.1 (independent professional judgment and candid advice) and 3.1 (meritorious claims and arguments). He explains he negotiated with the Kansas Estate Recovery Program to void the deeds, bringing the property back into M.L.'s estate. The only incentive the Program had to do so was to receive compensation for the Medicaid lien, and doing so would result in there being some property in the estate that might provide A.L. some assets as a beneficiary of M.L.'s estate.

But the Disciplinary Administrator correctly points out that, even if we accept Crandall's explanation as true, Crandall still violated KRPC 1.4 because Crandall failed to inform A.L. of all relevant aspects of the settlement negotiations and terms of the proposed order, did not explain his rationale for waiving any homestead right, and did not obtain A.L.'s agreement to do so. Of the three issues the hearing panel identified regarding a violation of KRPC 1.4, this is the most serious and, even when considered alone, warrants discipline.

### 6.2     *Crandall violated KRPC 1.7.*

The hearing panel next concluded Crandall had a concurrent conflict of interest under KRPC 1.7. A concurrent conflict of interest arises when "there is a substantial risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." KRPC 1.7(a)(2) (2018 Kan. S. Ct. R. 302). A lawyer may continue the representation only under certain circumstances when there is a concurrent conflict of interest, including obtaining informed consent, confirmed in writing, from the client. KRPC 1.7(b).

The hearing panel, Crandall, and the Disciplinary Administrator appear to agree that Crandall had no duty to A.L. individually. Instead, Crandall's duty was to A.L. as personal representative of the estate. Crandall points this court to the Kansas Bar

Association's Probate & Trust Administration After Death (7th ed. 2008) to support this position. The hearing panel went outside Kansas, to South Dakota and California, to find caselaw supporting the proposition that the client is the personal representative in the capacity as executor, not the estate. The Disciplinary Administrator cites a Court of Appeals case, *In re Estate of Pritchard*, 37 Kan. App. 2d 260, 154 P.3d 24 (2007) (concluding in dicta that a certified public accountant appointed administrator and his lawyer owed no duty prior to July 2006 to the surviving spouse who was not the personal representative to inform her of any possible homestead rights or other statutory rights).

Because no party disputes the issue, we will assume, but not decide, that the Disciplinary Administrator and Crandall have correctly stated Kansas law. And certainly this assumption is valid here because of the contract between Crandall and A.L., which limits Crandall's representation of A.L. to his role as personal representative.

Although the hearing panel agreed that Crandall represented A.L. in his capacity as personal representative, its analysis later appears to have focused on A.L.'s claim as an individual. For example, the panel's analysis emphasized A.L.'s desire to remain in the home. The panel concluded that knowledge triggered a duty to refer A.L. to other counsel for that particular claim or for Crandall to personally advise A.L. to pursue a homestead claim. Perhaps most significantly for this analysis, the panel concluded: "Agreeing to the 2011 order, which waived A.L.'s homestead claim without A.L.'s authority, was in direct conflict [with] his client." The panel here appears to have found a conflict based on A.L.'s personal right to a homestead claim rather than focusing its analysis on what duty Crandall owed A.L. as personal representative. The Disciplinary Administrator rightly concedes that the panel may have erred when it held Crandall owed a legal duty to A.L. in his individual capacity.

41

Although the Disciplinary Administrator concedes the panel may have erred, the Administrator argues Crandall still owed a duty to A.L. individually, at least to advise A.L. of a potential conflict between his personal interest and his role as personal representative, after Crandall became aware A.L. wished to remain in the home. Prudent counsel in this circumstance would have advised A.L. of the potential conflict and complied with KRPC 1.7. In support of this view, the Disciplinary Administrator cites a South Carolina ethics advisory opinion that considered an attorney's duty to inform a surviving spouse of his or her right to claim an elective share. S.C. Bar Ethics Advisory Committee Op. No. 93-34 (1993), *available at* [https://www.scbar.org/lawyers/legal-resources-info/ethics-advisory-opinions/eao/ethics-advisory-opinion-93-34/](https://www.scbar.org/lawyers/legal-resources-info/ethics-advisory-opinions/eao/ethics-advisory-opinion-93-34/) (last visited _____ 2018). The South Carolina opinion emphasized that where the interested beneficiary (there, the surviving spouse, here, A.L.) is also the personal representative, "the attorney is duty bound to inform the parties of the potential for conflict, and to comply with all relevant provisions of Rules 1.7 and 1.9."

We agree with the South Carolina approach. If a potential conflict was readily apparent, as it was here, Crandall should have advised A.L. of the potential for conflict in A.L.'s competing roles as personal representative and beneficiary. Crandall should have protected the client and himself by disclosing the possibility to A.L. and encouraging A.L. to consult another lawyer if he had any questions about his personal interest as a beneficiary of his mother's estate.

Crandall's personal interest in the case hampered his ability to identify and protect his client from this conflict. See KRPC 1.7(a)(2). Crandall's own testimony revealed he thought the sale of the house was the only path to having his fee paid. In fact, he delayed the filing of his motion to withdraw because he did not think he was likely to get paid if he withdrew. And any hope of payment out of estate assets would be foreclosed if A.L. successfully asserted a homestead claim. Crandall's personal interest in being paid out of

42

the proceeds appears to have impeded his professional judgment. It is not clear whether Crandall affirmatively hid the issue or whether his own interest affected his ability to fully advise A.L. Nonetheless, he violated KRPC 1.7 because he allowed his personal interest in being paid out of estate assets to interfere with A.L.'s representation.

### 6.3   *Crandall Violated KRPC 8.4(d).*

Under KRPC 8.4(d) (2018 Kan. S. Ct. R. 381), it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." The panel found two instances of prejudicial conduct:  (1) his inaction in over seven years and five months of representing the estate, resulting in the court dismissing the case, and (2) his filing of an opposition to A.L.'s petition for determination of homestead.

The Disciplinary Administrator correctly points out Crandall asserts no new law or argument here. Instead, he refers the court to his earlier argument that KRPC 2.1, KRPC 3.1, KRPC 3.3(a)(2), and the Kansas Probate Code support his position. The Disciplinary Administrator encourages this court to conclude the panel's conclusion on the violation of KRPC 8.4(d) is supported by clear and convincing evidence.

The first basis relied on by the panel—inaction—is supported by our precedent. Recently, in *In re Sullivan*, 308 Kan. 456, 469, 473, 420 P.3d 1001 (2018), we found clear and convincing evidence establishing a violation of 8.4(d) when a lawyer repeatedly ignored court orders in a pending case and when the lawyer's criminal conduct interfered with and caused delays in other pending cases. In *In re Hult*, 307 Kan. 479, 493, 498, 410 P.3d 879 (2018), we concluded clear and convincing evidence establishing the respondent failed to file an answer, respond to a motion for default judgment, appear in court, and provide information required by a subpoena in a malpractice case established a violation of KRPC 8.4(d). And in *In re Harrington*, 305 Kan. at 651, 661, we agreed with

43

a panel's determination that a respondent violated KRPC 8.4(d) by failing to obtain statutorily required court approval before paying himself fees in an estate case.

The second basis supporting the panel's conclusion—Crandall's opposition to the homestead claim—also finds support in our caselaw that holds actions creating a conflict of interest amount to a KRPC 8.4(d) violation. *In re Odo*, 304 Kan. 844, 375 P.3d 320 (2016), supports that position. There, we found clear and convincing evidence supported the panel's conclusion that a KRPC 8.4(d) violation occurred based on a series of steps taken adverse to the lawyer's former client, including appearing on his own behalf adversely to a former client relating to his attorney fees and expenses. 304 Kan. at 849, 853, 857. Although the case involved a former client and other actions adverse to the client, at least one of the factual circumstances supporting the violation of KRPC 8.4(d) included the attorney's attempt to secure his attorney fees and expenses.

In short, clear and convincing evidence supports the panel's conclusion that Crandall's conflict of interest motivated his inaction and later his opposition to A.L.'s claim. As a result, Crandall violated KRPC 8.4(d).

7. *Crandall violated KRPC 1.3 by failing to diligently and promptly represent the executor of the estate.*

KRPC 1.3 (2018 Kan. S. Ct. R. 292) requires a lawyer act "with reasonable diligence and promptness in representing a client." KRPC 1.3, comment 2 (2018 Kan. S. Ct. R. 292) explains,

> "Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests

44

are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness."

The hearing panel concluded Crandall violated KRPC 1.3 by failing "to diligently and promptly represent the executors of the estate of M.L. The estate was pending for more than seven years. Much of that delay was attributable to the respondent's lack of diligence."

Crandall does not appear to dispute that failing to diligently and promptly represent the executors of the estate can constitute a KRPC 1.3 violation. And with good reason. In *In re Coggs*, 270 Kan. 381, 392, 14 P.3d 1123 (2000), we found a KRPC 1.3 violation when a lawyer failed to promptly close an estate. There, evidence showed a lawyer took only one step toward closing the estate—getting his client appointed administrator—during three years of representing a client and no other person's conduct prevented timely disposition or relieved the lawyer of his responsibility to act with reasonable diligence and promptness. And in *In re Jones*, 287 Kan. 112, 193 P.3d 893 (2008), we found a KRPC 1.3 violation arising out of Michael Jones' representation of an estate. Michael recommended his brother Stephen, also a lawyer, serve as administrator. Stephen liquidated assets, paid creditors, paid himself, then placed the net proceeds in a noninterest bearing account. For about seven years, Stephen failed to distribute proceeds to the heirs and Michael failed to take any action to cause Stephen to promptly distribute the proceeds. Under these circumstances, we concluded Michael violated KRPC 1.3. 287 Kan. at 114-15, 118; see also *In re Jones*, 286 Kan. 544, 186 P.3d 746 (2008).

Crandall argues there was no evidence "demonstrating that the length of this case was due to Respondent's lack of diligence." He claims the evidence instead points to other sources of the delay, including the death of the estate's first personal representative, difficulty selling the house, A.L. intentionally delaying and avoiding Crandall, difficulty

45

communicating with the attorney for the Kansas Estate Recovery Program, and efforts to negotiate with the sisters about the deeds and will contest. One panel member, in a concurring and dissenting opinion, concluded at least some communication issues were attributable to A.L. Although the panel member does not specifically link the communication issues to the KRPC 1.3 violation, it seems a fair inference to find the client-communication issues contributed to the delay.

That said, the panel's conclusion that *much* of the delay is attributable to Crandall is supported by clear and convincing evidence. The estate was open for more than seven years with little court activity. A review of Crandall's bills show long periods with little or no activity in the case. Crandall filed the Petition for Probate of Will and Issuance of Letters Testamentary on behalf of Anthony on September 27, 2007. Crandall's motion to withdraw was granted on January 20, 2015. Crandall was involved in the case for around 90 months. He billed in only 37 of those. That means there is no billing activity in 53 months, including: (1) a period of eight months with no billing in 2008, (2) only one month with any billing activity during the entirety of 2010, and (3) again only one month with any billing activity during the entirety of 2014. Crandall's own bills belie his effort to shift blame to others. The bills show he did absolutely nothing related to the estate for half the time he had the case. We note there is some conflict between Crandall's bills and his "Activity Log" that he provided as an exhibit. The Activity Log shows eight additional months of "activity." In seven of those months we find no corresponding billing entry. And in the eighth, Crandall billed A.L. for a fee incurred but entered no time. But even if we credit Crandall the additional months listed in the activity log, he worked 45 out of 90 months in which he held the file. The panel's conclusion that much of the delay is attributable to Crandall's inaction is supported by clear and convincing evidence.

8. *Crandall violated KRPC 1.1 and KRPC 8.4(d) by failing to seek an extension of time.*

KRPC 1.1 (2018 Kan. S. Ct. R. 289) requires lawyers provide clients competent representation, which it explains "requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." The hearing panel concluded Crandall violated this rule by failing to prepare properly for representing the executors in M.L.'s estate and failing to seek a statutorily required extension of time. Under KRPC 8.4(d) (2018 Kan. S. Ct. R. 381), it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

We previously considered whether an attorney's failure to comply with statutory probate procedures resulted in KRPC violations. See *In re Alig*, 285 Kan. 117, 169 P.3d 690 (2007); see also *State v. Johnson*, 219 Kan. 160, 163-64, 546 P.2d 1320 (1976) (finding violation of prior ethics rules based on attorney's failure to file inventory and appraisal within time required by Kansas Probate Code). In *Alig*, we adopted the panel's conclusions that the attorney violated KRPC 1.1 and 8.4(d). 285 Kan. at 123. Alig's lack of competence in violation of KRPC 1.1 was established by his failure "to provide sufficient direction to the administrator or oversight of the administrator's actions as administrator and when he failed to seek review and approval of the attorney fees paid from the estate account" as required by statute. 285 Kan. at 120-21. We also adopted the panel's conclusion that Alig violated KRPC 8.4(d) by seeking and obtaining "payment for attorney fees from the administrator of the estate without the court's review and approval. Because of Respondent's actions, the court had to conduct a hearing on this matter." 285 Kan. at 121.

Crandall concedes he failed to request an extension of time required under K.S.A. 59-1501 because he forgot the statutory requirement. He simply asks us to find his failure

was not a rule violation. But *Alig* and clear and convincing evidence support the panel's conclusion Crandall violated KRPC 1.1 and 8.4(d).

9. *Crandall violated KRPC 1.5 by charging an unreasonable fee when he charged $16,388.32 for an estate that significantly decreased in value during the pendency of the probate case.*

Although KRPC 1.5 identifies eight factors to consider in determining reasonableness, the main contention appears to be whether it was appropriate for the panel to consider the amount charged compared to the value of the estate. It does not appear Kansas cases have previously discussed or adopted this approach to considering whether a fee charged is unreasonable.

We also note that in this instance we have a district court determination that the fee was unreasonable, applying the eight-factor test set out in KRPC 1.5. We are mindful that the standard for determining reasonableness varies somewhat depending on the circumstances in which it is raised:  "A lawyer's fee shall be reasonable but a court determination that a fee is not reasonable shall not be presumptive evidence of a violation that requires discipline of the attorney." KRPC 1.5(c) (2018 Kan. S. Ct. R. 294).

With these considerations in mind, we consider whether Crandall's fee was unreasonable.

9.1    *Time and labor required, novelty and difficulty, and skill required*

The hearing panel concluded the "estate should not have required much time and labor." Crandall should have directed A.L. to have the only asset, the property, appraised early on, addressed the deed dispute, objectively reviewed the homestead issue, and negotiated the Medicaid lien. No advanced legal skill was required.

48

Crandall disputes that conclusion, arguing the "issues surrounding the homestead issue in this matter were sufficiently complex that they escaped the understanding of [the second district judge], the Disciplinary Administrator, and the Panel." He also disputes the panel's conclusion the case should not have required much time or labor. Crandall points to the invoices he presented as evidence of the time spent. And while those invoices verify the time billed, they are not beyond criticism.

Crandall's staff billed for clerical duties, such as mailing the contract and fee schedule to A.L. While necessary steps, these are not the type of legal work that warrants charging the client. See Annotated Model Rules of Professional Conduct, Rule 1.5, p. 80 ("Work done for the lawyer's own benefit may not be billed to the client."); see also *Harris Trust & Sav. v. Am. Nat. Bank*, 230 Ill. App. 3d 591, 599, 594 N.E.2d 1308 (1992) (holding general overhead expenses "are incorporated into the hourly attorney fee charged to the client, and accordingly, cannot be separately itemized and charged as costs in an action for attorney fees"); cf. *Scimeca*, 265 Kan. at 751 (noting the hearing panel concluded unethical billing practices included charging for secretarial time, but ultimately not ruling on that particular issue).

Especially troubling is the time Crandall charged for work necessitated by his own delays in pursuing the probate action. For example, the court asked for briefing on the issue of jurisdiction since A.L.'s petition for probate came more than six months after M.L. died. Crandall should not have billed this time to the client. See Annotated Model Rules of Professional Conduct, Rule 1.5, pp. 79-81. And around half the work Crandall or his firm performed on this case appears motivated by Crandall's desire to bring the house, the estate's sole asset, back into the estate and negotiate with the Kansas Estate Recovery Program to allow sufficient funds to remain in the estate to pay Crandall's fees. This is most evident in a bill from June 2012 totaling $8,148.76. A review of the entries

on the bill shows most relate to Crandall's efforts to record the second deed, which conveyed the property to the trust rather than the sisters; to negotiate a settlement; and to prepare for the hearing on the Kansas Estate Recovery Program's petition to set aside the deeds. Throughout his representation he urged A.L. to sell the property. He also charged for his motion to withdraw and application for attorney fees in 2009. In summary, Crandall billed for items related to securing action for his personal benefit and not his clients'.

Crandall also complains that there was no evidence presented about the time he should have spent on the matter. But there was some evidence of this—the district court's order on petition for allowance of attorney fees and expenses was before the panel. While KRPC 1.5(c) makes it clear that a court's determination that a fee is not reasonable is not presumptive evidence of an ethical violation, it does not preclude using the determination in considering how much time and labor were required. And in other contexts, we have commented:

> "[A] district court is considered an expert on the issue of attorney fees. *Link, Inc.* [ *v. City of Hays*]*,* 268 Kan. [372,] 382[, 997 P.2d 697 (2000)]. It 'may apply its own knowledge and professional experience in determining the value of services rendered. [Citation omitted.]' *Service v. Pyramid Life Ins. Co.,* 201 Kan. 196, 221-22, 440 P.2d 944 (1968). Moreover, '[a]ppellate courts are also experts on the reasonableness of attorney fees. However, we do not substitute our judgment for that of the district court on the amount of the fee unless "in the interest of justice" we disagree with the district court. [Citations omitted].' *Link, Inc.,* 268 Kan. at 383." *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 940, 135 P.3d 1127 (2006).

As a result, while the district judge's ruling is not dispositive, we consider his determination as it weighs on the factors listed in KRPC 1.5(a):  What time and labor was required, what is the novelty and difficulty of the questions involved, and what skills are

50

required to perform the legal service properly? We conclude, based on the district judge's reduction in Crandall's billed time, that the time and labor required, novelty, and difficulty of the questions involved are not commensurate with Crandall's billing. We therefore determine that the hearing panel's conclusion on this factor is supported by clear and convincing evidence based on Crandall's billing records and the judge's order on the petition for allowance of attorney fees and expenses.

### 9.2. *Preclude other employment*

The panel concluded the representation would not have precluded other employment given the small size of the estate and the clarity of the issues. Crandall does not argue against this conclusion.

### 9.3 *Fee customarily charged*

The panel acknowledged the hourly fees charged by Crandall over the course of this litigation (ranging from $150 to $250 per hour) are customary for the Kansas City area. The panel concluded, however, that charging $16,388.32 is not customary for an estate valued at $35,000.

Crandall argues the second conclusion is not relevant. He would instead limit the panel and our consideration to the reasonableness of his hourly fee and the lack of any evidence suggesting he did not spend the time he reported in his timesheets. Crandall also argues limiting the fee based on the size of the estate is contrary to public policy because it would lead attorneys to withdraw from representation when their fees get too high relative to the value of the estates. He asks the court to consider comment 3 to KRPC 1.5, which he selectively quotes as stating "'a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount.'"

The full clause is not as limited as Crandall indicates: "[A] lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client." KRPC 1.5, comment 3 (2018 Kan. S. Ct. R. 296). The full comment highlights the problem with Crandall's handling of the representation: Once the fees in a case exceed a foreseeable amount, there should be a conversation with the client about the fees, the goals of the litigation, and whether those goals can be reasonably achieved. It does not appear any conversation like this happened here.

The Disciplinary Administrator reminds us that we cannot decide the reasonableness of a fee based on any single factor. See *Johnson*, 281 Kan. 930, Syl. ¶ 6. The Disciplinary Administrator also points us to other jurisdictions that have determined the amount of the fee compared to the size of the estate is an appropriate consideration, citing *In re Estate of Johnson*, 119 P.3d 425, 433-34 (Alaska 2005).

The *Estate of Johnson* court pointed to Annot., 58 A.L.R.3d 317, § 2. See 119 P.3d at 433 n.27. That annotation commented: "[T]he amount involved is a factor accorded greater significance in fixing fees for attorneys involved in rendering services with respect to decedents' estates, than in the case of many other types of legal services." The annotation also notes fees may be larger if an attorney's efforts "result in a substantial augmentation of the estate, a distinction being made between a fee for an estate whose assets are routinely included and an estate where assets must be produced or obtained." Time, on the other hand, in the estate context may be accorded less significance than in other areas of law. Annot., 58 A.L.R.3d 317, § 2.

The caselaw cited in the annotation supports the panel's comparison of the fee with the size of the estate. Even so, the panel should have considered that the house may have remained outside the estate if Crandall had not cooperated with the Kansas Estate Recovery Program to void the deeds.

9.4     *The amount involved and the results obtained*

The panel concluded the estate was small and Crandall accomplished little for the estate in the seven-plus years of his representation. The panel also noted the value of the estate diminished over the course of Crandall's representation and Crandall tried to charge fees more than one-half the estate's total value.

Crandall responds that the amount involved is zero because he was never paid. He alternatively points to the fact that the estate had no assets but would have been net positive had his settlement with the Kansas Estate Recovery Program been allowed to proceed. He blames the second district judge for thwarting his plan by allowing the homestead claim.

Even so, the estate's value increased from $0 to $35,000 during the course of Crandall's representation. But that amount could have been greater had Crandall acted more promptly, before the value of the real property at issue diminished to half what it had been. We therefore conclude the panel's findings on this point are supported by clear and convincing evidence.

9.5     *Time limitations imposed by client or circumstance*

The panel here concluded the clients imposed no time limitation. The estate thus languished for more than seven years while Crandall failed to meet statutory deadlines.

Crandall argues clear and convincing evidence does not support the panel's conclusion. He says the evidence established one of the clients and circumstances prolonged the estate. He cites one of the concurring and dissenting opinions, which placed some responsibility for any delay on A.L. refusing to communicate when he received bills he could not pay and refusing to discuss the homestead issue with Crandall after the relationship deteriorated.

The Disciplinary Administrator responds the panel did consider the client's delay in the first factor. The Disciplinary Administrator argues this factor is intended to consider extra work or a premium charged to handle something in a limited time.

We agree with the Disciplinary Administrator's proposed reading because it distinguishes between subsections (a)(5) and (a)(1). But even if we were to agree with Crandall's reading, clear and convincing evidence supports the panel majority's conclusion. The evidence Crandall cites concerns A.L.'s testimony that he stopped reading Crandall's e-mails because they were bills. But A.L. also testified he answered the phone every time Crandall called. The majority could have credited A.L.'s testimony and concluded Crandall could have overcome any circumstances using the form of communication to which A.L. consistently responded.

9.6    *Nature and length of relationship with client*

Neither Crandall nor the Disciplinary Administrator makes any argument against the hearing panel's conclusions that the relationships were limited to the estate proceedings.

9.7    *Crandall's experience, reputation, and ability*

Neither Crandall nor the Disciplinary Administrator addresses the hearing panel's conclusion that the only evidence of Crandall's experience, reputation, or ability came from Crandall's testimony.

9.8    *Fixed or contingent fee*

Neither Crandall nor the Disciplinary Administrator contradicts the hearing panel's conclusion that the fee agreement was calculated by the hour.

In summary, we conclude clear and convincing evidence supports the hearing panel's conclusion that Crandall violated KRPC 1.5 by charging an unreasonable fee. While Crandall's fee is disproportionate to the size of the estate, the most troubling points are that (1) Crandall failed to discuss the growing amount of the attorney fee with his client and (2) he charged for fees he should not have.

CONCLUSION REGARDING VIOLATIONS OF THE KRPC

We unanimously determine that the fees in two cases were unreasonable in violation of KRPC 1.5(a) and that Crandall violated KRPC 1.1 (competence), 1.3 (diligence), 1.4(b) (communication), 1.7(a) (concurrent conflict of interest), and 8.4(d) (conduct prejudicial to the administration of justice).

STANDARDS FOR IMPOSING LAWYER SANCTIONS

In addressing the standards for imposing lawyer sanctions, the hearing panel reported:

"109. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"110. *Duty Violated*. The respondent violated his duty to his clients to provide competent and diligent representation and adequate communication. Additionally, the respondent violated his duty to his clients to avoid conflicts of interest. The respondent violated his duty to his clients to charge reasonable fees. Finally, the respondent violated his duty to the legal system and the legal profession to expedite litigation.

"111. *Mental State*. The respondent knowingly violated his duties.

"112. *Injury*. As a result of the respondent's misconduct, the respondent caused actual and potential injury to his clients. Further, by the time the estate was closed, the value of the estate had greatly diminished.

"113. *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"a. Selfish Motive. Much of the respondent's misconduct involved a selfish motive—he did not explain the homestead exemption to A.L. to further his ability to collect his fee, he encouraged A.L. to sell his home to further his ability to collect his fee, he took no action in M.L.'s estate case so that he might yet be able to collect his fee, etc. The hearing panel concludes that the respondent was motivated by selfishness.

"b. Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4(b), KRPC 1.5(a), KRPC 1.7(a), and

KRPC 8.4(d). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"c. <u>Refusal to Acknowledge Wrongful Nature of Conduct</u>. The respondent refused to acknowledge that his conduct violated any of the rules of professional conduct. Accordingly, the hearing panel concludes that the respondent refused to acknowledge the wrongful nature of his conduct.

"d. <u>Vulnerability of Victim</u>. A.L., B.A., and V.A. were vulnerable to the respondent's misconduct.

"e. <u>Substantial Experience in the Practice of Law</u>. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1999. While the respondent did not have substantial experience in the practice of law at the time the misconduct began, a majority of the hearing panel concludes that he has substantial experience in the practice of law now.

"f. <u>Nonrefundable Fee</u>. As an additional aggravating consideration, in the fee agreements entered by Anthony L. and A.L., the respondent offered a fee agreement which included an advanced nonrefundable fee to be earned by future services. At the hearing on this matter, the respondent asserted that it was 'not relevant because it was not selected.' However, the fact remains that the respondent proposed a nonrefundable fee. Nonrefundable fees are strictly prohibited by the Kansas Supreme Court. See *In re Scimeca*, 265 Kan. 742, 759-60, 962 P.2d 1080 (1998). The respondent needs to understand that he may not propose a nonrefundable fee. The fact that the respondent proposed a nonrefundable fee concerns the hearing panel.

"g. <u>Attitude and Tone</u>. It is difficult to discern from a cold record how witnesses appear in person. The respondent's attitude and tone is worth noting as something he should consider going forward. The respondent appeared to be angry and condescending throughout the disciplinary proceeding. The respondent was not cooperative in answering questions. He treated Mr. Hazlett with open hostility. The respondent's facial expressions and demeanor throughout the proceedings reflect negatively on his ability to consider his

actions with a reasonable measure. Finally, the words he chose to use in the documents as well as in his testimony regarding [the second district judge] also reflect his poor attitude and his unprofessional approach when confronted with an adverse opinion.

"114. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"a. <u>Absence of a Prior Disciplinary Record</u>. The respondent has not previously been disciplined.

"b. <u>Absence of a Dishonest Motive</u>. The respondent's misconduct does not appear to have been motivated by dishonesty.

"115. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

"'4.32   Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

"'4.33 Reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client.

"'4.42 Suspension is generally appropriate when:

"'(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

58

"'(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

"'4.43 Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.

"'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

"'7.3 Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'"

Crandall filed exceptions to these paragraphs from the hearing panel's final report but makes no specific argument against the hearing panel's conclusions in this section. As a reminder, our standard of review deviates here from the clear and convincing evidence standard. All that is required here is some evidence to be presented for the panel to weigh in arriving at an appropriate discipline. See *Biscanin*, 305 Kan. at 1220; *Hall*, 304 Kan. at 1014. And some evidence supports all the panel's conclusion.

Some considerations weigh heavily here. First and foremost, Crandall refuses to acknowledge the wrongful nature of any of his conduct. Merely finding he refused to acknowledge any wrongful conduct somewhat understates what he did here—Crandall does not just refuse to acknowledge he did anything wrong; he aggressively attacks anyone, including a district court judge, who rules against him. This is related to the panel's findings on attitude and tone. The hearing panel was concerned it may be

"difficult to discern from a cold report how witnesses appear in person." But at least some of this disdain comes through the written record.

In mitigation, the panel noted Crandall's lack of disciplinary record and absence of dishonest motive. The panel's conclusion that Crandall had a conflict of interest in his representation of A.L. arguably contradicts its conclusion that dishonesty did not motivate Crandall's misconduct. Crandall did not discuss any possible homestead right with A.L., which appears to have been in part motivated by his desire to receive payment out of the estate's asset. If not outright dishonesty, there was at least some intent to conceal relevant information from his client. Thus, we do not consider this factor to be among the mitigating circumstances, leaving only the hearing panel's finding that Crandall lacked a disciplinary history to consider in mitigation.

A majority of the hearing panel recommended that Crandall's license to practice law be suspended for a period of six months. The third panelist recommended a one-year suspension. Before us, Crandall asked that we dismiss the two complaints.

A majority of the court determines that a six-month suspension from the practice of law is the appropriate discipline. A minority would impose a lesser sanction.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that DAVID P. CRANDALL be and he is hereby disciplined by suspension from the practice of law in Kansas for a period of six months effective upon the filing of this decision, in accordance with Supreme Court Rule 203(a)(2) (2018 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that the respondent comply with Supreme Court Rule 218 (2018 Kan. S. Ct. R. 262).

IT IS FURTHER ORDERED that the respondent undergo a reinstatement hearing pursuant to Kansas Supreme Court Rule 219 (2018 Kan. S. Ct. R. 264) before he may be reinstated.

IT IS FURTHER ORDERED that the costs of this action be assessed to the respondent and that this order be published in the official Kansas Reports.

BILES, J., not participating.
KEVIN BERENS, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Berens was appointed to hear case No. 117,910 vice Justice Biles under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.